AMERICANS UNITED FOR SEPA-
RATION OF CHURCH AND
STATE et al.

v.

Newell J. PAIRE, as Commissioner of
Education of the State of New
Hampshire et al.

Civ. A. No. 72-3.

United States District Court,
D. New Hampshire.

Sept. 13, 1972.

---

Walter C. Wright, Jr., Woodbury, N. J., Kenneth E. Scott, Wilton, N. H., for plaintiffs.

Robert E. Hinchey, Burns, Bryant, Hinchey, Cox & Shea, Dover, N. H., for Roman Catholic Bishop of Manchester.

Howard B. Myers, Concord, N. H., for Attorney General of State of New Hampshire.

## OPINION

BOWNES, District Judge.

The plaintiffs in this action challenge on First Amendment grounds the constitutionality of a facilities lease and dual enrollment agreement between the Nashua School District and the Holy Infant Jesus School of the Roman Catholic Bishop of Manchester whereby the School District leases classroom space in the building of the Holy Infant Jesus School and uses the leased space for the teaching of only secular courses solely to the students of the Holy Infant Jesus School.

Jurisdiction is based on 28 U.S.C. § 1331, with the matter in controversy exceeding $10,000, exclusive of interest and costs.

New Hampshire has a dual enrollment statute which became effective July 1, 1969:

*School Attendance*

*Dual Enrollment.* Notwithstanding any other provision of the law, the full-time attendance requirement may be met by attendance at more than one school provided the total time spent in the schools is equivalent to full-time attendance and further that the attendance at more than one school may include attendance at a nonpublic school provided that the school district and the state board of education have given prior approval to the detailed dual enrollment agreement, which is to be effectuated for this purpose. NH RSA 193:1-a.

The financing of a dual enrollment program is provided by NH RSA 198:21:

*Dual Enrollment Grants*

I. Any school district which has in operation an approved dual enrollment agreement under the provisions of RSA 193:1-a shall be granted for the first school year that such agreement is in operation the full operational costs of implementing such agreement, exclusive of any part of the cost and

carrying charges of any capital improvements; and for the next succeeding school year, if such operation is then continued, one half of such costs.

\* \* \* \* \* \*

The plaintiffs do not challenge the constitutionality of either of the above statutes, but have concentrated their attack on the lease and dual enrollment agreement.[1]

## THE FACTS

The essential facts have been stipulated by the parties. The dual enrollment agreement and lease are admitted to be in full force and effect and are typical of agreements and leases entered into between other church schools and other school districts in the State of New Hampshire.[2] The leased facilities consist of five contiguous classrooms and an office all located on one corridor in one end of the second floor of the Holy Infant Jesus School building. The facilities are leased at a reasonable rate of $2.50 per square foot and contain no crucifixes, religious symbols or artifacts either in the classrooms or in the corridor connecting the leased classrooms. The name assigned to these facilities is the Arlington Street Annex School, all of whose students are also students of the Holy Infant Jesus School.

The Holy Infant Jesus School is a Roman Catholic parochial school controlled by a religious organization for the purpose of propagating and promoting the Roman Catholic faith. It contains identifying religious symbols both on the exterior and interior of the building. The teaching staff of the Holy Infant Jesus School consists of nine nuns of various religious orders, who wear a distinctive religious uniform.

The curriculum of the Arlington Street Annex School is composed of entirely secular subjects consisting of Language Arts, Science, Math, Music, and Physical Education which are taught exclusively by teachers employed by the Nashua School District. These teachers are certified by the State Board of Education, are subject to the supervision and direction of the Superintendent of the Nashua Public Schools, and are subject to the same rules and regulations as all other teachers in the Nashua public school system. One of these teachers serves as principal of the Arlington Street Annex School.

The students in the Holy Infant Jesus School are all between the ages of five and fourteen, and the students in the Arlington Street Annex School are in grades four through eight. The students spend one-half day in the Holy Infant Jesus School. The Arlington Street Annex School operates on the same calendar basis as all other public schools in Nashua and has the same holidays and vacation schedule. The Holy Infant Jesus School and the Arlington Street Annex School each maintain separate attendance records. All of the textbooks and other educational equipment and aids except notebooks used in the Arlington Street Annex School are furnished by the Nashua School District and are the same as those used in other public schools. Students may purchase notebooks independently from other sources. The students who receive instruction in the Arlington Street Annex School receive a separate report card from the Nashua School District evaluating their work.

The Nashua School District makes lease payments to the Holy Infant Jesus School. These payments cover leased space and custodial care. The School District makes no other payments of any kind and receives no other services from the Holy Infant Jesus School. The funds required to pay the rent under the lease between the Holy Infant Jesus

1. Neither party requested the convening of a three-judge court. At the preliminary pretrial conference, the plaintiffs waived their request for a temporary restraining order.

2. Although the stipulation does not expressly so state, Roman Catholic schools are the only church schools in the state to enter into such agreements with the school districts.

School and the Nashua School District and in other dual enrollment programs throughout the state exceed $10,000 and are ultimately obtained by the taxing power of the State of New Hampshire or a subdivision thereof and are transmitted to the lessor by an agency of the state government.

The New Hampshire State Department of Education published "Guidelines for Applying for Dual Enrollment and Child Benefit Services Grants" as provided by the New Hampshire Revised Statutes Annotated, Chapter 193, Section 1-a, which are part of the record in this case.

## THE LAW

It has long since been apparent that, despite the eloquence and intent of Thomas Jefferson, the First Amendment did not create a solid wall between church and state. Judicial interpretations given to the words, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof", have permitted openings and breaches in the wall separating church and state as long as they do not undermine the basic foundation and structure. The latest judicially developed test for determining whether a statute or state program can breach the First Amendment wall between church and state is tripartite. Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971):

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion,

Board of Education v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L. Ed.2d 1060 (1968); finally, the statute must not foster "an excessive government entanglement with religion. Walz [v. Tax Commission of City of New York, 397 U.S. 664,] at 674, 90 S.Ct. at 1414 [1409, 25 L.Ed.2d 697 (1970).] 403 U.S. at pages 612–613, 91 S.Ct. at page 2111.

The dual enrollment statute, the guidelines promulgated pursuant to it, and the lease and enrollment agreement have a secular legislative purpose. They are the direct result of the current financial crisis in Roman Catholic grammar and high school education which is not peculiar to New Hampshire, but which is manifest in every state with a sizeable Roman Catholic population.[3]

Because of rising costs, due particularly to the decline in teaching nuns and the consequent increase in lay teachers, Roman Catholic parishes in New Hampshire, as elsewhere, are finding it increasingly difficult to support their parochial schools.[4] In New Hampshire, as in all other states with a sizeable Roman Catholic population, the curtailment and closing of parochial schools means a sharply increased burden not only on the taxpayers but on existing public school facilities which in many instances are already inadequate. This attempt to breach the First Amendment wall between church and state is not being made to propagate or proselytize a religious faith but rather represents a frantic effort to postpone and lessen the impact of the breakdown of what has hitherto been a dual educational system.[5]

---

3. According to Louis R. Gary, former chairman of Cardinal Spellman's Committee on Educational Research and consultant to President Nixon's Commission on School Finance, Catholic schools throughout the country are closing their doors at the rate of one a day and United States Catholic elementary and secondary school enrollment has dropped 18% in the last three years. See "Myths, Money, and Catholic Schools," Saturday Review, July 22, 1972.

4. See DiCenso v. Robinson, 316 F.Supp. 112, 115 (D.R.I.1970).

5. See article by Paul A. Freund, "Public Aid to Parochial Schools," 82 Harv.L. Rev. 1680 (1969), and Note, Establishment and Free Exercise of Religion, 85 Harv.L.Rev. 167 (1971).
   The Vermont Legislature in 1971 enacted a statute specifically authorizing "providing teachers and educational materials for the teaching of physical sci-

The existence of parochial grammar and secondary schools in New Hampshire, as elsewhere, has been so common and widespread that, until recently, local school boards have based their planning for future public school educational needs on the accepted fact that a certain percentage of children in the community would not be attending public schools. The lease and dual enrollment agreement, therefore, pass the first requirement of having a secular legislative purpose.

The second criterion that the principal effect of the program must be one that neither advances nor inhibits religion is a different matter. Under the lease and contract agreement public school teachers are furnished to the Holy Infant Jesus School for the teaching of secular subjects in classrooms leased from that school. Despite the careful wording of the guidelines and the lease, the only accurate characterization of this practice is that it amounts to a direct subsidy. Semantics cannot change the facts. The State of New Hampshire pays the salaries of the teachers who teach only parochial school pupils. In addition, the state pays the Holy Infant Jesus School the sum of $8,937 for the classroom space which the public school teachers use during the school year. To be precise, this amounts to a double subsidy. Such a public subsidy is constitutionally impermissible. In the words of Justice Brennan:

> Thus for more than a century, the consensus, enforced by legislatures and courts with substantial consistency, has been that public subsidy of sectarian schools constitutes an impermissible involvement of secular with religious institutions. Lemon v. Kurtzman, *supra*, 403 U.S. at pages 648, 649, 91 S.Ct. at page 2129.

ences, modern languages, physical education and mathematics, or any combination thereof, in any nonpublic school approved by the state board of education, . . . . ." 16 V.S.A. § 3441(6). This

In People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), the Supreme Court struck down an Illinois program under which religious teachers employed by private religious groups were permitted to come into public schools weekly and teach religious subjects. The Court, through Mr. Justice Black held:

> Here not only are the State's tax-supported public school buildings used for the dissemination of religious doctrines. The State also affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the State's compulsory public school machinery. This is not separation of Church and State. At page 212, 68 S.Ct. at 466.

The facts in the instant case are almost the exact opposite of those in *McCollum*, but the same principle applies. Here the state affords a sectarian group an invaluable aid in that it provides teachers for secular classes in a parochial school through the use of the state's dual enrollment statute. It is the lease and contract agreement that accomplish this. The statute, itself, like Illinois' compulsory education law, does not offend the First Amendment. There would seem to be no constitutional obstacle to parochial school students attending a bona fide public school along with other public school pupils.

Nor can it be cogently argued that this is the equivalent of the "released time" program approved in Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952):

> This "released time" program involves neither religious instruction in public school classrooms nor the ex-

statute was recently held unconstitutional by a three-judge court. Opinion by Judge Waterman, March 16, 1972, 339 F.Supp. 545.

penditure of public funds. At pages 308–309, 72 S.Ct. at page 681.

In contrast, the instant case involves "released teachers" furnished with the expenditure of public funds to a sectarian school with the space used being paid for by public funds.

It is urged, however, that the lease and contract agreement is but a logical extension of the furnishing of transportation of parochial school students approved in Everson v. Board of Education of Township of Ewing, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), and the loaning of textbooks to parochial school pupils approved in Board of Education of Central School District No. 1 v. Allen, Commissioner of Education of New York, 392 U.S. 236, 88 S.Ct. 1923, 20 L. Ed.2d 1060 (1968). The difference may be only one of degree, but as pointed out in *Allen* at page 242, 88 S.Ct. at page 1926:

> The problem, like many problems in constitutional law, is one of degree. Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952).

The angle of degree becomes constitutionally impermissible when it is acutely enlarged from providing buses and textbooks to providing teachers.

The lease and contract also fail to pass the requirement that they cannot foster an excessive government entanglement with religion. Walz v. Tax Commission of City of New York, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); Lemon v. Kurtzman, *supra*. Here we have an avowed public school located on the second floor of a parochial school building. This floor is leased from the Roman Catholic Bishop of Manchester by the Nashua School District. The only pupils of the public school are those who attend the parochial school. The public and parochial school facilities are not only entangled, they are merged into one. It is important to note that except for the leased space on the second floor this school has all of the outward and interior appearance of a Roman Catholic school.

The guidelines formulated by the New Hampshire State Department of Education, among other things, provide:

> The dual enrollment plan must be approved by vote of the school district at an annual or special meeting, prior to submission to the state board of education. In cities with fiscally dependent school departments the approval shall rest in the hands of the appropriate governmental unit—city council, board of aldermen, etc. Guidelines dated 6/12/70, page 2, 2.a.

This provision carries in it the seeds of community controversy and divisiveness along religious lines that the Chief Justice warned against in Lemon v. Kurtzman, *supra*, 403 U.S. at pages 622–623, 91 S.Ct. at page 2115:

> A broader base of entanglement of yet a different character is presented by the divisive political potential of these state programs. In a community where such a large number of pupils are served by church-related schools, it can be assumed that state assistance will entail considerable political activity. Partisans of parochial schools, understandably concerned with rising costs and sincerely dedicated to both the religious and secular educational missions of their schools, will inevitably champion this cause and promote political action to achieve their goals. Those who oppose state aid, whether for constitutional, religious, or fiscal reasons, will inevitably respond and employ all of the usual political campaign techniques to prevail. Candidates will be forced to declare and voters to choose. It would be unrealistic to ignore the fact that many people confronted with issues of this kind will find their votes aligned with their faith.
>
> Ordinarily political debate and division, however vigorous or even parti-

san, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect.

. . .

The cost and financing of a dual enrollment plan will become an annual controversy involving the school board, the pertinent city governmental unit, and the public.[6] I do not think I am overreaching in taking judicial notice of the fact that school financing is now one of the most hotly contested issues in New Hampshire community life. To add to this already volatile subject the heat engendered by religious feeling is certain to result in a community explosion of bitterness and hostility.

### RULING AND JUDGMENT

I rule that the lease and the dual enrollment agreement between the Holy Infant Jesus School and the Nashua School District violate the religious clause of the First Amendment of the United States Constitution and are, therefore, null and void. Judgment for the plaintiffs.

Although the plaintiffs originally asked for a preliminary injunction, they agreed that if this opinion were not issued prior to the start of the school year, they would not seek an immediate injunction but would wait for the case to run its appellate course. No injunction will issue, therefore, pending appeal. If no appeal is taken, the Clerk is directed to schedule an early conference of counsel so that the judgment of this court can be put into effect without jeopardizing unduly the education of the children already involved in the dual enrollment agreement for the current school year.

No costs.

So ordered.

6. I am aware that NH RSA 198:21 appears to limit the financial grants to two years, but it would be a simple matter

for the legislature to amend the statute or enact a new one at every session.