AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE et al., Plaintiffs,

v.

The BOARD OF EDUCATION OF the BEECHWOOD INDEPENDENT SCHOOL DISTRICT et al., Defendants.

No. 1561.

United States District Court,
E. D. Kentucky,
Covington Division.

Jan. 14, 1974.

James F. Ogden, Covington, Ky., for plaintiffs.

Gordon H. Hood, Cincinnati, Ohio, Charles H. Deters, Covington, Ky., for defendants.

## OPINION

SWINFORD, District Judge.

This action assails as unconstitutional two contracts between the Board of Education of the Beechwood Independent School District (hereinafter: Beechwood), a publicly funded school, and the

Blessed Sacrament School (hereinafter: Blessed Sacrament), an institution controlled by the Catholic Church. The original complaint sought to enjoin the enforcement of a contract effective during the 1970–1971 school year. Although that agreement terminated in 1971, a new contract executed on April 29, 1971, contained virtually identical provisions; pursuant to agreed order an amended complaint was filed alleging state financial aid to a sectarian cause in violation of the First Amendment "Establishment" Clause. The plaintiffs seek a declaratory judgment of the contracts' unconstitutionality and damages representing the amounts paid in rents and teachers' salaries under the program. Trial without jury was held on July 7, 1972. The parties were afforded an opportunity for the submission of arguments and the record is now before the court for decision.

An initial issue of mootness is interposed since the second contract between the parties lapsed in 1972 and renewal was rejected by the Beechwood School Board. The plaintiffs argue this action is not moot in view of the defendants' failure to meet the "heavy burden" of demonstrating that the challenged practice will not recur: although urging the termination of the arrangements, the schools have nowhere represented that similar programs will be avoided in the future, United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); indeed, the sole reason for the nonrenewal in 1972 was the refusal of the Kentucky Attorney General to grant approval. It is also noted that, despite the termination of this particular agreement, similar contracts long in force throughout the Commonwealth demand an adjudication on the merits. Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

 Federal courts do not possess power to render advisory opinions on uncontested or academic matters. Caldwell v. Craighead, 6th Cir., 432 F.2d 213 (1970), cert. denied 402 U.S. 953, 91 S. Ct. 1617, 29 L.Ed.2d 123 (1971). However, the plaintiffs are correct in the contention that this controversy is not moot. As noted in Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29 (1944), a defense based on mootness is not viable where the parties would be free to resume challenged conduct in the absence of a substantive determination. Further, the issues raised in this action satisfy the four "tests" outlined in Super Tire Engineering Co. v. McCorkle, 3d Cir., 469 F.2d 911, 915 (1972):

> "Analysis . . . reveals four concerns that the Supreme Court addresses in terms of mootness. They are: that some sort of judicial decree be possible, that the parties remain in a posture sufficiently adverse to insure effective litigation, that the issue in contention continue to be concrete, and that the issue not be one that will recur and yet be unreviewable."

The contracts assailed by the plaintiffs were allegedly negotiated with the approval of the Kentucky Department of Education in response to compatible requirements by the two school systems: Beechwood lacked the space to accommodate numerous Blessed Sacrament students desirous of enrolling in certain secular courses, while the parochial school enjoyed a surplus of room. These conditions resulted in a "dual enrollment" agreement whereby Beechwood employees would be assigned to teach in facilities rented from Blessed Sacrament. The instructors, who were compensated by and considered employees of the public school, were required to spend one class period daily on the Beechwood campus and attend meetings and other activities sponsored by that school. Similarly, those taking the special classes at Blessed Sacrament were considered Beechwood students for purposes of that enrollment subject to disciplinary and administrative regulations governing students educated at the public school campus. The agreements also provided that Blessed Sacrament would adopt the Beechwood school calendar and schedule, remove all religious ornamentation from

the rented classrooms, and furnish janitorial service, furniture, lab equipment, and dining facilities. The rent due Blessed Sacrament under the contract effective 1970–1971 was determined with reference to the tuition which would be payable to Beechwood by those students attending the special classes who resided outside the Beechwood school district. The second agreement merely stated a rental of $1,250.00 per classroom per year, and provided that the "nonresident" students attending the special classes were to pay Beechwood tuition of $40.00 per teaching hour per year. It was stipulated that the Beechwood administration would periodically inspect Blessed Sacrament to insure compliance with the terms of the agreement.

■■ The point of departure for an analysis of suspected governmental intrusion into religious affairs must be an acknowledgement that the First Amendment prohibits not merely the erection of a national religion:

"Its authors did not simply prohibit the establishment of a state church or a state religion . . . Instead they commanded that there should be 'no law *respecting* an establishment of religion.' A law may be one 'respecting' the forbidden objective while falling short of its total realization. A law 'respecting' the proscribed result . . . is not always easily identifiable as one violative of the Clause. A given law might not *establish* a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment." Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

While the demarcation of violative practices is ultimately one of degree, Id. at 614, 91 S.Ct. 2105, an examination of the contract and its implementation reveals an impermissible involvement with religion as contemplated by court decisions construing the Establishment Clause.

The Court in Lemon v. Kurtzman, supra, held that a law or practice respecting religion must satisfy three tests to withstand invalidation on constitutional grounds:

"First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, . . . finally, the statute must not foster 'an excessive government entanglement with religion.'" Id. at 612–613, 91 S.Ct. at 2111.

Examination of the subject agreements belies conflict with at least two of the above standards.

The defendants argue that the secular purpose of the contracts is manifest by the nature of the courses taught by the loaned instructors; the site of the classes was occasioned solely by space limitations at Beechwood and should not be cast to pervert the true purpose of the agreement: to aid all children, regardless of faith. The plaintiffs reply that there was no threat of a sudden influx of parochial students to Beechwood since the evidence reveals no hint of financial instability on the part of Blessed Sacrament. The avowals of a desire to confer equal aid are countered by the absence of any suggestion that a clamor for public instruction in secular subjects originated with the students or their parents. The defendants' suggestion that Blessed Sacrament was merely a Beechwood "annex" is rebutted by the nonexistence of any student migration for other classes, activities, or athletic events. Rather, enrollees in the special classes were for all other purposes considered parochial students who ultimately received Blessed Sacrament diplomas. The extension theory is further negated by the comparative proportion of out-of-district students attending the two schools: while the roster of Blessed Sacrament included many nonresidents, Beechwood rarely admitted youths from outside the district and, indeed, bore no responsibility for their tutelage.

The plaintiffs' arguments that the purpose of the contracts was to foster Catholicism bears some merit; however, this court is inclined to respect the defendants' position that the agreement was designed to secure equality in the instruction of non-religious subjects. Further, the Supreme Court has recognized that the maintenance of societal diversity is a legitimate secular goal in negotiating arrangements of this nature. Committee for Public Education v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 2963, 37 L.Ed.2d 948 (1973). A decision on this issue is unnecessary, however, since the challenged contracts clearly effectuate religious advancement and foster excessive government administrative entanglement.

The defendants urge that the solvent financial condition of Blessed Sacrament proves that the primary effect of the agreements could not logically have been to aid religion. Any incidental pecuniary benefit which might inure to the religious school is no less defensible than aid granting reimbursement for private school transportation, Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), textbook loans, Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), or property tax exemptions, Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). The plaintiff responds that the financial status of the institution receiving aid is immaterial where, as here, the principal effect of the program is to aid religion through freeing resources for the outright propogation of spiritualism; a concomitant improvement in the secular educational sphere does not immunize this agreement where other methods exist to retain the "neutral" advantages without improperly furthering religious ideals. The plaintiffs note that the purported aspirations could be attained by transporting Blessed Sacrament students to classes at Beechwood or rented facilities in a non-religious atmosphere.

The court finds the aid approved in Everson, Allen, and Walz distinguishable from that accorded in the case at bar. State provided transportation, unlike public instruction in a religious school, is imbued with a sectarian aura comparable to the police and fire protection furnished by public agencies. Everson v. Board of Education, supra, 330 U.S. at 17, 67 S.Ct. 504. While textbook loans approach impermissibility, such grants at least assure that the textual content is essentially secular. Board of Education v. Allen, supra. Legislation conferring a tax-exempt status to church property claims justification in historical precedent, Walz v. Tax Commission, supra, 397 U.S. at 673–678, 90 S.Ct. 1409; such exemptions are constitutionally acceptable for reasons not applicable to the benefits here challenged: (1) a coercive exercise of the tax power could conceivably result in the destruction of religion in violation of the First Amendment "Exercise" Clause; (2) provisions conferring tax immunity generally benefit all "charitable" assets regardless of religious affiliation; (3) such enactments lessen the possibility of conflict with the "entanglement" criterion and thus "sail between the Scylla and Charybdis of 'effect' and 'entanglement.'" Committee for Public Education v. Nyquist, supra, 413 U.S. 756, 93 S.Ct. 2955, 2973, 37 L.Ed.2d 948.

The difficulties in applying the "primary effect" standard were alleviated somewhat in Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973). Holding that aid which merely frees resources for religious propogation is not thereby improper, the Court restated the "sectarian effect" criterion:

"Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting." Id., 93 S. Ct. at 2874.

The record in the case at bar is replete with indicia of the religious pervasive-

ness in Blessed Sacrament School: the nature of the faculty, student body, curriculum, and controlling authority undeniably and unexceptionally portray the school as " 'an integral part of the religious mission of the Catholic Church.' " Lemon v. Kurtzman, supra 403 U.S. at 616, 91 S.Ct. at 2113.

An almost identical educational arrangement was struck down by a single judge in Americans United for Sep. of Church & State v. Paire, D.N.H., 348 F. Supp. 506 (1972); although the First Circuit Court of Appeals vacated this decision on jurisdictional grounds and remanded for consideration by a three judge panel, Americans United for Sep. of Church & State v. Paire, 1st Cir., 475 F.2d 462 (1973), a subsequent opinion in conformity with that mandate reached the same conclusion. Americans United for Sep. of Church & State v. Paire, D.N.H., (three judge), 359 F. Supp. 505 (1973). The agreement condemned in Paire provided that the public board of education would lease rooms in a parochial school for instruction in secular subjects by public teachers; the contract also recited that the leased rooms were to be free of religious ornamentation. The loaned teachers were considered employees of the public board. Separate student grading records were maintained by the two institutions, and parochial students were considered public enrollees for purposes of the special classes. Although bearing a secular purpose, the agreement violated the other criteria of impermissible religious interference. The court found that the stipulated rental payments and use of publicly employed teachers effectuated a dual subsidy:

"Under the lease and contract agreement public school teachers are furnished to the Holy Infant Jesus School for the teaching of secular subjects in classrooms leased from that school. Despite the careful wording of the guidelines and the lease, the only accurate characterization of this practice is that it amounts to a direct subsidy. . . . The State . . . pays the salaries of the teachers who teach only parochial school pupils. In addition, the state pays . . . $8,937 for the classroom space which the public school teachers use during the school year. To be precise, this amounts to a double subsidy." 348 F.Supp. at 509.

The opinion suggested that the practice of locating public teachers in church schools was no less harmful than impermissible state provisions allowing nuns to teach sectarian courses in public schools:

"In People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203 [68 S.Ct. 461, 92 L.Ed. 649] . . . (1948), the Supreme Court struck down an Illinois program under which religious teachers employed by private religious groups were permitted to come into public schools weekly and teach religious subjects. . . . The facts in the instant case are almost the exact opposite of those in McCollum, but the same principle applies. Here the state affords a sectarian group an invaluable aid in that it provides teachers for secular classes in a parochial school . . . ." Id.

See Johnson v. Sanders, D.Conn., 319 F. Supp. 421 (1970), aff'd 403 U.S. 955, 91 S.Ct. 2292, 29 L.Ed.2d 865 (1971).

The defendants' undoubted humanitarian motivation is of no avail where government relationships yield a primary effect of advancing religion:

"(T)he 'fault' lies . . . with the Establishment Clause itself: 'Congress' and the States by virtue of the Fourteenth Amendment 'shall make no law respecting the establishment of religion.' With that judgment we are not free to tamper . . . ." Sloan v. Lemon, 413 U.S. 825 at 835, 93 S. Ct. 2982 at 2988, 37 L.Ed.2d 939 (1973).

Application of the third constitutional standard is unnecessary in view of the determination above; however, a cursory appraisal of the aid program reveals excessive administrative entanglement

represented by both routine and potential contacts between the two schools. At a minimum, the agreement contemplates the interaction of two groups of teachers with respect to students and schedules, the maintenance of dual financial and attendance records, and daily joint decisions respecting the operation of the schools. The public school is further burdened by paperwork attending the "nonresident" students—a concern beyond the normal responsibilities of that institution. Similar factors led the three judge court in Paire to find excessive entanglement:

"It places a 'public school' physically in the middle . . . of a parochial school. Using Holy Infant facilities, the public school teachers deal entirely with pupils enrolled at Holy Infant, sharing responsibility for their total instruction with the religious nuns who teach the same pupils at other hours. Such a partnership . . . requires a continual interaction of the two faculties, whatever the niceties of their legal relationship. Student discipline, joint use of common facilities, and joint concern for individual students, make interaction not only likely but unavoidable. . . . The joint participation of public school teachers in the daily activities of a parochial school invites either some compromise by Holy Infant's staff of their own guaranteed right to the free exercise of religion, or, by the secular teachers, of their secular independence. It fuses church and state inextricably in a church-dominated setting. Even more serious entanglement is bound to occur at higher levels. Administratively, Holy Infant has now become part of the responsibilities of the Nashua School Board. Frequent negotiations . . . over matters such as the number, adequacy and personality of the teachers . . . would seem to be unavoidable." 359 F.Supp. at 510–511.

■ Excessive government entanglement with religion may also result from a state's efforts to insure the secular purpose and effect of cooperative programs. Thus, contractual restrictions pertaining to religious decorations purport to insure a secular atmosphere, but themselves contemplate precautionary inspections by public authorities. See Hunt v. McNair, supra. Entanglement of a more pervasive nature may be spawned by the "divisive political effect" of government aid programs:

"Partisans of parochial schools . . . will inevitably champion this cause and promote political action to achieve their goals. Those who oppose state aid . . . will inevitably respond and employ all of the usual political campaign techniques to prevail. Candidates will be forced to declare and voters to choose. It would be unrealistic to ignore the fact that many people confronted with issues of this kind will find their votes aligned with their faith.

Ordinarily political debate and division . . . are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect." 403 U.S. at 622, 91 S.Ct. at 2116.

It would be improper to base invalidation of an otherwise legitimate program upon this possibility alone. Committee for Public Education v. Nyquist, supra 413 U.S. 756, 93 S.Ct. 2955, 2977, 37 L. Ed.2d 948; however, the likelihood of political conflict is an appropriate consideration in assessing the character of state aid arrangements. The sectarian effect and potential administrative entanglement occasioned by the assailed agreements reveal a breach of the "wall of separation between Church and State" erected by the First Amendment. McCollum v. Board of Education, 333 U.S. 203, 211, 68 S.Ct. 461, 465, 92 L.Ed. 649 (1948).

■ Despite this conclusion, the court has determined that the relief in

the case at bar will be limited to a declaratory judgment that the agreements in question violate the Establishment Clause of the First Amendment. While the retroactivity question addressed in Lemon v. Kurtzman, 411 U.S. 192, 93 S. Ct. 1463, 36 L.Ed.2d 151 (1973) (Lemon II), is not precisely analogous to the question of damages presented herein, the philosophy expressed in that opinion is highly relevant. Although approving the standard of retroactivity outlined in Linkletter v. Walker, 381 U.S. 618, 629, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Court invoked the following equitable considerations in permitting Pennsylvania to reimburse parochial schools for services performed prior to Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (Lemon I): (1) the relative impairment of constitutional interests; (2) the extent and propriety of the defendants' reliance on the violative practice. This court is unaware of any manner in which the denial of damages will impair the interests affected by the question at bar. Further, the defendant school systems have relied on the defective contracts. There is no indication of bad faith or a plainly unlawful practice; rather, the schools secured the approval of state authorities before executing the agreements. The difficulty of ascertaining acceptable conduct under the First Amendment is exemplified by both the pervasive judicial concern in this area and the confession by Chief Justice Burger in Lemon I that "we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." 403 U.S. at 612, 91 S.Ct. at 2111. As noted in Lemon II, public agencies must govern without prior court pronouncements:

> "Appellants ask . . . that we hold those charged with executing state legislative directives to the peril of having their arrangements unraveled if they act before there has been an authoritative judicial determination . . . Appellants would have state officials stay their hands until

newly enacted state programs are 'ratified' by the federal courts, or risk draconian, retrospective relief should the legislation fall . . . (A)ppellants' position could seriously undermine the initiative of state legislators and executive officials alike." 411 U. S. at 207–208, 93 S.Ct. at 1473.

See also Chevron Oil Co. v. Huson, 404 U.S. 97, 105, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971); Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).