CITIZENS TO ADVANCE PUBLIC EDUCATION v STATE
SUPERINTENDENT OF PUBLIC INSTRUCTION

1. SCHOOLS AND SCHOOL DISTRICTS—NONPUBLIC SCHOOL STUDENTS—
   SHARED TIME—PREMISES USED AS PUBLIC SCHOOL—NONPUBLIC
   SCHOOLS—CONSTITUTIONAL LAW.
   The state constitution does not prohibit the use of public funds
   for nonpublic school students receiving shared time services
   upon premises occupied by lease or otherwise for public school
   purposes under the authority, control and operation of the
   public school system by public school personnel as a public
   school open to all eligible to attend a public school because they
   are public schools even though the lessor or grantor is a
   nonpublic school and even though the premises are contiguous
   or adjacent to a nonpublic school (Const 1963, art 8, § 2).

2. SCHOOLS AND SCHOOL DISTRICTS—CONSTITUTIONAL LAW—NONPUBLIC
   SCHOOLS—STATE ASSISTANCE—ESTABLISHMENT CLAUSE.
   The three-part test for determining whether a particular form of
   state assistance to nonpublic schools violates the First Amend-
   ment requires that under the Establishment Clause the law in
   question: (1) must reflect a clearly secular legislative purpose,
   (2) must have a primary effect that neither advances nor
   inhibits religion, and (3) must avoid excessive government
   entanglement with religion (US Const, Am I).

3. SCHOOLS AND SCHOOL DISTRICTS—CONSTITUTIONAL LAW—NONPUBLIC
   SCHOOLS—INDIRECT STATE ASSISTANCE—ESTABLISHMENT CLAUSE.
   Indirect and incidental benefits to church-related schools do not
   offend the Establishment Clause of the First Amendment (US
   Const, Am I).

4. SCHOOLS AND SCHOOL DISTRICTS—CONSTITUTIONAL LAW—NONPUBLIC
   SCHOOLS—SHARED TIME—LEASED NONPUBLIC PREMISES—SECU-
   LAR EDUCATIONAL PROGRAMS.
   Shared time secular educational programs, in which nonpublic
   students attend public school classes for part of their school day
   and which are operated with public funds on premises leased

REFERENCE FOR POINTS IN HEADNOTES
[1–4] 68 Am Jur 2d, Schools §§ 299–306.

from nonpublic schools, do not offend the Michigan and United States Constitutions where the programs are under the authority and control of public schools, are operated by public school employees, are open to all students eligible to attend public schools, and the programs merely enable parents to take advantage of both the secular education offered by public schools and the sectarian education offered by parochial schools (US Const, Am I; Const 1963, art 8, § 2).

Appeal from Ingham, James T. Kallman, J. Submitted June 12, 1975, at Lansing. (Docket Nos. 22482–22485.) Decided October 14, 1975. Leave to appeal applied for.

Complaint by Citizens to Advance Public Education, and others, against John Porter, State Superintendent of Public Instruction, Allison Green, State Treasurer, State Board of Education, Center Line Board of Education, Bay City Board of Education, Warren Consolidated Board of Education, and others, for injunctive relief to enjoin the operation of shared-time secular educational programs in conjunction with parochial schools. Summary judgment for plaintiffs. Defendants appeal. Reversed.

*MacLean, Seaman, Laing & Guilford; Bernard J. Feiger; Levin, Levin, Garvett & Dill* (by *Erwin B. Ellman*)*;* and *Bellison & Doctoroff,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Gerald F. Young* and *Charles F. Keeley,* Assistants Attorney General, for defendants Porter, Green and State Board of Education.

*Thomas D. Rinehart,* for defendant Center Line Board of Education.

*William M. Lambert,* for defendant Bay City Board of Education.

*Charles H. Earl,* for defendant Warren Consolidated Board of Education.

*Amicus Curiae: Running, Wise & Wilson,* for Traverse City School District.

Before: ALLEN, P. J., and M. F. CAVANAGH and O'HARA,* JJ.

M. F. CAVANAGH, J. These appeals arose from a single action instituted in Ingham County Circuit Court by the plaintiffs to enjoin the three defendant-appellant schools from operating shared time secular educational programs. These programs are funded, in part, by state school appropriations. The trial court granted plaintiffs' motion for a summary judgment and entered an order enjoining the operation of the programs. The trial judge concluded that the programs constituted an establishment of religion contrary to the First Amendment to the United States Constitution and to art 8, § 2 of the Michigan Constitution of 1963.

The three programs challenged in this case vary in terms of the details of their operations, but they have important common characteristics. Each public school district has leased premises from a parochial school. On these premises, the districts operate a shared time educational program.[1] Secular subjects are taught by teachers employed by the public school systems. These teachers are supervised and controlled solely by the public school systems and utilize books and materials purchased with public funds. The classes are open to all

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] For an explanation of the meaning of "shared time", *see Traverse City School District v Attorney General,* 384 Mich 390, 411 n 3; 185 NW2d 9 (1971).

children eligible to attend public school. Children who are also enrolled in a parochial school attend the public school instruction during part of the day and private classes for the remainder of the day. Each of the public school districts receives state aid in support of the programs, the amount of aid being determined according to the percentage of each student's day which is spent in a public school classroom. Evidence of religious objects and symbols have almost entirely been removed from the leased areas.[2]

It is helpful to examine briefly the circumstances and conditions of each of the three programs. The Center Line School District leases a building from the Catholic Archdiocese of Detroit. Public school teachers provide instruction for students in grades 3 through 8. Most of the students attend the school half days and attend St. Clement's Catholic School for the remainder of the day. The classes taught at the leased building are identical to those being taught in publicly owned school buildings. The leased buildings also are used to provide other services not connected to parochial students, such as special classes for pregnant girls from several Macomb County districts.

The Bay City School District leases several classrooms at two of the Roman Catholic high schools in Bay City. Teachers employed by the public school provide instruction in art, vocational education, drafting and physical education. The students are taught during the remainder of the day by

---

[2] The Warren program has removed all religious articles from the leased premises. The same is true in Center Line except for one cross which is an integral part of a supporting wall. The record is unclear as to whether religious objects are visible in the Bay City program. Under the lease, the lessor covenanted to remove all religious symbols from the rooms leased. According to affidavits from two Bay City School officials, this has been accomplished. Under these circumstances, we assume that almost all religious symbols and articles have been removed from each of the three facilities.

teachers employed by the parochial schools. The public school teachers are under the control of the principal of Bay City Central High School.

The public school system in Warren, like that of Center Line, leases a building from the Catholic Archdiocese of Detroit. The leased building is connected by a passageway to an adjacent Catholic school. Children in grades 3 and 5 through 8, attend school in the leased premises half days and in a parochial school for the remainder.

In the trial court, all parties moved for summary judgment. No disputes as to issues of fact are involved since plaintiffs have accepted as true defendants' answers in response to interrogatories.

The First Amendment states in part:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * * ."

Likewise, the Michigan Const 1963, art 8, § 2 states:

"The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin."

The key Michigan case in this area is *Traverse City School District v Attorney General,* 384 Mich 390; 185 NW2d 9 (1971), which considered certified questions concerning a constitutional amendment to art 8, § 2. The Court struck down that part of the amendment which prohibited any assistance to nonpublic school students "at any location or institution where instruction is offered in whole or in part to such nonpublic school students". The certi-

fied question and the Court's answer are helpful in resolving the present litigation:

"Does Proposal C preclude the provision, through shared time or dual enrollment programs, of elementary or secondary instruction or educational services to nonpublic school students at any nonpublic school or at any other location or institution where instruction is offered in whole or in part to such nonpublic school students?

*"Answer:* At the public school, no; on leased premises, not necessarily; on nonpublic school premises, not necessarily." 384 Mich 390, 410.

*Traverse City* distinguished shared time programs from programs involving direct financial assistance from the state to parochial schools:

"Shared time differs from parochiaid in three significant respects. First, under parochiaid the public funds are paid to a private agency whereas under shared time they are paid to a public agency. Second, parochiaid permitted the private school to choose and to control a lay teacher whereas under shared time the public school district chooses and controls the teacher. Thirdly, parochiaid permitted the private school to choose the subjects to be taught, so long as they are secular, whereas shared time means the public school system prescribes the public school subjects. These differences in control are legally significant." *Id.* at 413–414.

Preliminarily, it is worthwhile to note that these three distinctions—payment to a public agency, choice and control of teachers by the public school district, and choice of subjects by the public school system—are all satisfied by the three programs under consideration in this case. At the oral argument of this cause in this Court, counsel for plaintiff-appellee stated his concurrence with the fact that each of the three programs involved

complies with the guidelines set down in *Traverse City.*

Finally, the Court considered, in general terms, the legitimacy of a shared time program held on premises leased from a nonpublic school:

> "Premises occupied by lease or otherwise for public school purposes under the authority, control and operation of the public school system by public school personnel as a public school open to all eligible to attend a public school are public schools. *This is true even though the lessor or grantor is a nonpublic school and even though such premises are contiguous or adjacent to a nonpublic school.*
>
> "Nonpublic school students receiving shared time services under such circumstances are in the same position as such students at any other form of public school and are entitled to the same rights and benefits. Consequently, as already noted, the valid portion of Article 8, § 2 does not prohibit funds for shared time under such conditions." *Id.* at 415. (Emphasis added.)

The trial court distinguished *Traverse City* by interpreting that case to apply only to programs of auxiliary services dealing with general health and safety measures. Since the present programs involve general instruction, the court reasoned, there is considerable opportunity for political and administrative entanglements. We think the lower court misread *Traverse City.* That opinion contains no language which would so limit the effect of its holding. The court did, however, note that special circumstances "may create unconstitutional religious entanglements, but shared time in and of itself does not". *Id.* at 417. We will consider subsequently whether such special circumstances are present.

Under *Traverse City* it is clear that the programs do not violate the Michigan Constitution.

Whether they are consistent with the First Amendment depends on the consideration of a number of cases from the United States Supreme Court. The three-part test for determining whether a particular form of state assistance violates the First Amendment is stated in *Committee for Public Education & Religious Liberty v Nyquist,* 413 US 756, 772–773; 93 S Ct 2955; 37 L Ed 2d 948 (1973):

"to pass muster under the Establishment Clause the law in question, first, must reflect a clearly secular legislative purpose, *e.g., Epperson v Arkansas,* 393 US 97; 89 S Ct 266; 21 L Ed 2d 228 (1968), second, must have a primary effect that neither advances nor inhibits religion, *e.g., McGowan v Maryland* [366 US 420; 81 S Ct 1101; 6 L Ed 2d 393 (1961)], *School District of Abington Township v Schempp,* 374 US 203; 83 S Ct 1560; 10 L Ed 2d 844 (1963), and, third, must avoid excessive government entanglement with religion, *e.g., Walz v Tax Comm'n* [397 US 664; 90 S Ct 1409; 25 L Ed 2d 697 (1970)]. See *Lemon v Kurtzman,* 403 US at 612–613; 91 S Ct at 2111; 29 L Ed 2d 745 (1971), *Tilton v Richardson,* 403 US 672, 678; 91 S Ct 2091, 2095; 29 L Ed 2d 790 (1971)."

See also *Lemon v Kurtzman,* 403 US 602, 612–613; 91 S Ct 2105; 29 L Ed 2d 745 (1971).

We concur with the trial court's assessment of the purpose of the three programs:

"The plans in these four cases before us have a secular legislative purpose: educating young people in secular subjects."

See *Committee for Public Education & Religious Liberty v Nyquist,* 413 US 756, 773.

As to the primary effect of the programs, we cannot say that there is no assistance afforded to

nonpublic schools. However, indirect and incidental benefits to church-related schools do not offend the Establishment Clause of the First Amendment. *Everson v Board of Education,* 330 US 1; 67 S Ct 504; 91 L Ed 711 (1947). *Lemon v Kurtzman,* 403 US 602, 616–617. The *primary* effect of the programs is to extend secular public school instruction to part-time students. They advance a religious institution to a much lesser extent than the program upheld in *Tilton v Richardson,* 403 US 672; 91 S Ct 2091; 29 L Ed 2d 790 (1971). In *Tilton,* millions of dollars in construction grants were appropriated by the Federal government to be sent to church-related colleges for secular educational purposes. The primary effect of that program was held to advance secular education, not religion. Likewise, the present programs' effect is primarily secular, not an advancement of religion. We further note that each of the involved school districts undertook its respective lease arrangement due to a pressing need for additional space and as a much less expensive alternative to new construction.

The third part of the test is whether the program results in an excessive entanglement between the government and a religious institution. Numerous recent cases have struck down plans which attempted to assist financially troubled nonpublic school systems. In *Sanders v Johnson,* 403 US 955; 91 S Ct 2292; 29 L Ed 2d 865 (1971), and *Marburger v Public Funds for Public Schools,* 417 US 961; 94 S Ct 3163; 41 L Ed 2d 1134 (1974), the Supreme Court affirmed Federal district court judgments which struck down two such plans of direct financial grants to private schools. In *Committee for Public Education & Religious Liberty v Nyquist, supra,* and *Sloan v Lemon,* 413 US 825; 93 S Ct 2982; 37 L Ed 2d 939 (1973), two plans for

the reimbursement of tuition paid by parents of nonpublic school students were invalidated. Similarly, in *Lemon v Kurtzman, supra,* and its companion case, *Earley v DiCenso,* the Court struck down programs under which Pennsylvania and Rhode Island supplemented the salaries of teachers who taught secular subjects in nonpublic schools.

The most recent decision invalidating a state program because of excessive entanglement is *Meek v Pittenger,* 421 US 349; 95 S Ct 1753, 1766–1767; 44 L Ed 2d 217, 235–236 (1975). In *Meek* the Court held that a Pennsylvania program of loaning instructional equipment to nonpublic schools and of providing "auxiliary services"—remedial and accelerated instruction, guidance counseling, speech and hearing services—violated the First Amendment. The Court's analysis concerning this latter program is relevant to the present case:

"The fact that the teachers and counselors providing auxiliary services are employees of the public intermediate unit, rather than of the church-related schools in which they work, does not substantially eliminate the need for continuing surveillance. To be sure, auxiliary services personnel, because not employed by the nonpublic schools, are not directly subject to the discipline of a religious authority. *Cf. Lemon v Kurtzman,* 403 US at 618; 91 S Ct at 2113. But they are performing important educational services in schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained. See *id.,* at 618–619; 91 S Ct at 2114. The potential for impermissible fostering of religion under these circumstances, although somewhat reduced, is nonetheless present. To be certain that auxiliary teachers remain religiously neutral, as the Constitution demands, the State would have to impose limitations on the activities of auxiliary personnel and then engage in

some form of continuing surveillance to ensure that those restrictions were being followed.

"In addition, Act 194, like the statutes considered in *Lemon v Kurtzman, supra,* and *Committee for Public Education & Religious Liberty v Nyquist, supra,* creates a serious potential for divisive conflict over the issue of aid to religion—'entanglement in the broader sense of continuing political strife.' *Committee for Public Education & Religious Liberty v Nyquist, supra,* 413 US at 794; 93 S Ct at 2976. The recurrent nature of the appropriation process guarantees annual reconsideration of Act 194 and the prospect of repeated confrontation between proponents and opponents of the auxiliary services program. The Act thus provides successive opportunities for political fragmentation and division along religious lines, one of the principal evils against which the Establishment Clause was intended to protect. See *Lemon v Kurtzman, supra,* 403 US at 622–623; 91 S Ct at 2116. This potential for political entanglement, together with the administrative entanglement which would be necessary to ensure that auxiliary services personnel remain strictly neutral and nonideological when functioning in church-related schools, compels the conclusion that Act 194 violates the constitutional prohibition against laws 'respecting an establishment of religion'." (Footnotes omitted.)

Although the Pennsylvania program has some similarities to the present ones, we conclude that there are sufficiently important differences not to warrant the invalidation of the three programs involved in this case. First, the *Meek* program was, in effect, a direct grant of assistance to private schools. The services were provided within parochial schools. In the present case, the secular instruction occurs on premises leased by the public school system. Although in some instances this occurs in an area contiguous to parochial instruction, the content of the activity on the premises leased is controlled solely by the public school district. The lessor has no authority whatsoever

concerning the activity at these extension public schools.

Second, unlike the restricted admission policy in *Meek,* the present programs are open to all children eligible to attend public schools. Further, the scheduling is arranged such that the children attend public schools during part of the day and private school during the remainder. This provides for a clear, time segregation of supervision by the two entities. Since the leased premises are both legally and actually public schools with public employees, there is no need for continuing surveillance to ensure that the teachers remain religiously neutral. The dangers in these programs are no greater than that posed by any public school teacher in an ordinary classroom setting.

As to administrative entanglement, the record does not disclose that extensive meetings between public and nonpublic school officials have been necessary. Indeed, it would seem that the public school system could independently decide what courses would be offered to part-time students and to provide for the classroom space and other details without the need to communicate continually with nonpublic school officials. We do not consider occasional communication between the two entities in order to smooth transitional difficulties to be the kind prohibited by the First Amendment. Likewise, since the programs are open to all, we see no serious potential for politically divisive conflict in the programs. Finally, we emphasize that these programs are operated under the authority and control of the public school system by public school personnel.

These circumstances, in our opinion, are closer to the classic released time program approved in *Zorach v Clauson,* 343 US 306; 72 S Ct 679; 96 L

Ed 954 (1952). There students were released from public school to attend religious classes. The Court concluded that this program violated neither the Free Exercise nor Establishment Clauses of the First Amendment:

"When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence." 343 US 306, 313–314.

Under the circumstances of the three programs before this Court, we likewise conclude that the shared time programs merely enable parents to take advantage of both the secular education offered by our public schools and the sectarian education offered by parochial schools.[3]

[3] We recognize that some lower Federal courts' opinions are to some extent conflicting with our conclusions. *See, e.g., Americans United for Separation of Church and State v Paire,* 348 F Supp 506 (D NH, 1972), *vacated and remanded 475 F2d 462 (CA 1, 1973), after remand* 359 F Supp 505 (D NH, 1973), and *Americans United for Separation of Church and State v Board of Education of Beachwood Independent School District,* 369 F Supp 1059 (ED Ky, 1974). However, we are more nearly in accord with the views expressed by the Nebraska Supreme Court in *State ex rel School District of Hartington v Nebraska State Board of Education,* 188 Neb 1; 195 NW2d 161 (1972), *cert den,* 409 US 921; 93 S Ct 220; 34 L Ed 2d 182 (1972).

Consequently, we hold that where shared time secular educational programs operated on premises leased from nonpublic schools are under the authority and control of public schools, are operated by public school employees, and are open to all students eligible to attend public schools, these programs do not offend the Michigan and United States Constitutions.

The trial court's grant of summary judgment in favor of plaintiffs is reversed. Judgment for defendants may enter. No costs, a public question being involved.