DR. BARBARA THOMPSON, State Superintendent Department of PublicInstruction
You requested my opinion regarding the leasing of rooms from parochial schools by the Milwaukee school district. The purpose of the lease arrangement is to provide Title I Elementary Secondary Education Act (ESEA) programs to children attending those schools. Title I of the ESEA, 20 U.S.C. sec. 241, et seq., as amended, provides for grants to state education agencies (SEA), in this case the Wisconsin Department of Public Instruction. The Act further provides that upon approval of local educational school district (LEA) programs, grants are to be made by the SEA to the LEAs that have a high concentration of low income families. The purpose of the grants to LEAs is to expand and improve the education of economically deprived children. 20 U.S.C. § 241 a, 241 b and 241 C as amended. Significantly, 20 U.S.C. § 241e-1 (a), created by Pub.L. 93-380, provides in part:
 "(a) To the extent consistent with the number of educationally deprived children in the school district of the local educational agency who are enrolled in private elementary and secondary schools, such agency shall make provision for including special educational services and arrangements (such as dual enrollment, educational radio and television, and mobile educational services and equipment) in which such children can participate . . . ."
20 U.S.C. sec. 1806 (Title IV sec. 406 ESEA) makes similar provisions providing "for [the] benefit of children" attending nonpublic schools "secular, neutral, and nonideological services, materials, and equipment . . . as will assure equitable participation of such children in the purposes and benefits of this subchapter." *Page 284 
Having in mind the foregoing, you specifically ask whether you may approve instruction for Title I students in rooms leased in parochial schools under the following circumstances:
 "The services will be provided in rooms leased for that purpose from the non-public schools. This arrangement was determined after consultation with the non-public representative, non-public school administrators, and the Milwaukee City Attorney's Office. Because of problems such as the distance between the non-public and the Title I public schools, the minimal space available in the public schools, and the disruptive nature of excusing pupils from their regular classrooms to travel to another building to participate in a Title I Program, and to travel back to the non-public school; it would be most difficult to assure that comparable and equitable services could be provided to non-public pupils in the public schools.
 "The Milwaukee Public Schools would assure that strict limitations would be imposed upon the Title I staff assigned to the leased facilities which would insure that their secular teaching duties were not intertwined with the teaching of religious doctrine. The supervisory and administrative staff of the Title I Program will provide continuous surveillance of the activities of the Title I staff to insure that these limitations are being followed. The lease arrangements with the non-public schools will clearly spell out the limitations being imposed and the safeguards being established.
 "Your opinion of whether this proposed plan for providing Title I services is permissible under the laws of Wisconsin and the United States is necessary in order for me to consider Milwaukee's Title I application. . ."
You also have informed me that assurances have been given by the representative for the parochial school Title I program that equitable services were being given to nonpublic school children. But this assurance was subject to the provision that "Title I services are offered on the premises of non-public schools as well as public schools."
I am also informed that in Milwaukee there are 100 parochial schools participating in the Title I program. Nineteen of these *Page 285 
parochial schools are proposed for the lease arrangement. It is estimated that the number of participants in these schools would be 476. The Milwaukee public school district is asking that two remedial reading and two mathematics teachers be funded to provide educational programs in the leased portion of the parochial schools.
It appears that the lease arrangement is felt to be necessary because of the disruption and inconvenience that would be caused the children, teachers and administrators in the parochial schools if the children were to be transported from the parochial school to the public school and back again. It also appears that the leased space will be an integral part of the parochial school. You do not state whether the lease arrangement provides for the attendance of public school children in the nonpublic school. Nor do you provide in detail the terms of the lease, such as the amount of rent to be paid and the restrictions on the furnishings in the rooms that may be imposed. Even though specific details concerning the lease agreement are lacking, I feel that the question broadly stated can be answered. This question is whether a public school district may, in order to implement a public educational program, lease space from a parochial school for the primary purpose of providing educational programs to the children attending the parochial school. Lease arrangements such as this one would not be confined to Title I programs nor to the Milwaukee public school district. Thus, I view the question as having applicability beyond the Milwaukee school system.
In 64 Op. Att'y Gen. 136 (1975), I concluded that funds made available to the Wisconsin Department of Public Instruction under Title I of the ESEA could not be used in Wisconsin to pay teaching personnel in parochial schools. I also concluded in 64 Op. Att'y Gen. 139 (1975) that services and materials could not be provided on parochial school premises. The proposed distinction here is that the space leased from the parochial school, while still an integral part of the premises, would, by virtue of the lease, be under the control of the public school administration.
For substantially the same reasons given in previous opinions, and for the reasons which follow, I conclude that an arrangement whereby a public school district would lease from the parochial schools school rooms to provide ESEA educational programs to parochial school children would confer a benefit to parochial schools *Page 286 
which would violate Wis. Const. art. 1, sec. 18. The relevant part of this section provides "nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries."
In State ex rel. Reynolds v. Nusbaum, 17 Wis.2d 148, 165,115 N.W.2d 761 (1962), the Wisconsin Supreme Court held that a statute providing for transportation of parochial school children to the nearest public school that they were entitled to attend violated that part of art. 1, sec. 18, quoted above. In reaching this conclusion, the court stated that the establishment clause of the first amendment of the U.S. Constitution "lends itself to more flexibility of interpretation" than art. I, sec. 18. Article 1, sec. 18 has since been amended to permit the use of public funds to transport parochial school children. However, it is my opinion that the reasoning of the court in State ex rel. Reynoldsv. Nusbaum applies with equal force to a public school leasing classrooms from parochial schools for the primary purpose of providing educational programs for parochial students. This is so regardless of the subjects taught in the leased space or whether or not the control of the premises resides in the landlord or the tenant. Payment of the cost of this program with public funds clearly would provide a benefit to the parochial schools and therefore would violate art. 1, sec. 18.
We are not in this opinion concerned with whether art. 1, sec. 18, would prohibit the lease of space from parochial schools where the purpose is to provide space for children attending public schools. That was the situation that existed in Dorner v.School District, 137 Wis. 147, 118 N.W. 353 (1908). There, rent of parochial space for public school students was necessary because of lack of space in the public school. The court inDorner had no occasion to consider whether the payment of rent amounted to drawing money from the treasury for the benefit of religious societies. Because of the narrow issues involved in that case and in view of subsequent development of case law involving church-state relationships, I do not regard that case as having value as a precedent with respect to the issue now under consideration. Compare Thomas v. Schmidt, 397 F. Supp. 203
(D.R.I. 1975). Nor are we dealing with a situation which requires the use of private facilities for the education of handicapped children as provided by sec. 115.85 (2)(d), Stats. State ex rel.Warren v. Nusbaum, 64 Wis.2d 314, 219 N.W.2d 577 (1974). Furthermore, I *Page 287 
would not regard as controlling in this situation the fact that the lease may provide for attendance in the leased space of children attending public schools as well as those attending parochial schools. Thus, in Americans United for Sep. of Church Stale v. Paire, 359 F. Supp. 505 (D. N.H. 1973), a three-judge federal district court held that an arrangement whereby both public and parochial pupils could attend classes held in rooms of a parochial school leased by the public school system promoted excessive governmental entanglement. See also Americans U. forSep. of Church State v. Board of Ed., 369 F. Supp. 1059 (E.D. Ky. 1974).
If a constitutional amendment to art. 1, sec. 18, was required to permit public funds to be spent to transport students to parochial schools, then certainly a constitutional amendment would be required to permit the use of public funds to provide classrooms for parochial school students in lieu of transportation to public schools. State ex rel. Reynolds v.Nusbaum, supra.
In addition, in State ex rel. Warren v. Nusbaum, 55 Wis.2d 316,332-333, 198 N.W.2d 650 (1972), the court stated:
 ". . . While words used may differ, both the federal and state constitutional provisions relating to freedom of religion are intended and operate to serve the same dual purpose of prohibiting the `establishment' of religion and protecting the `free exercise' of religion. So our holding that the statute involved violates the first amendment is a holding that, in these particulars, it also violated art. 1, sec. 18, Wisconsin Constitution." See also State ex rel. Weiss v. District Board, 76 Wis. 177, 209, et seq., 44 N.W. 967 (1890).
This language from Nusbaum means that the cases decided by the federal courts, including the U.S. Supreme Court, have value as precedent with respect to interpretation of Wis. Const. art. I, sec. 18.
In Wolman v. Walter, 433 U.S. 229, 53 L.Ed.2d 714,97 S.Ct. 2593 (1977), the Court held that to use public funds to provide instructional materials and equipment on the premises of parochial schools would violate the establishment clause. To the same effect, see Meek v. Pittenger, 421 U.S. 349 (1975). In theWolman case, 53 L.Ed.2d at 733-734, the Court stated: *Page 288 
 "Appellees seek to avoid Meek by emphasizing that it involved a program of direct loans to nonpublic schools. In contrast, the material and equipment at issue under the Ohio statute are loaned to the pupil or his parent. In our view, however, it would exalt form over substance if this distinction were found to justify a result different from that in Meek."
Similarly, in the present case I do not believe that our state supreme court would approve the lease arrangement which is so clearly designed to avoid the ruling in State ex rel. Reynolds v.Nusbaum, supra, and Wolman v. Walter, supra. Despite a technical change in tenants, the lease is simply a device to place teachers, materials and equipment funded with public money on the premises of parochial schools. This arrangement would inevitably create a flow of assistance to support the sectarian enterprise. This is true even though the space rented and the materials used cannot be diverted to religious use. Nonsectarian space, like nonsectarian materials and equipment paid for with public funds, cannot be provided on the premises of parochial schools without violating the establishment clause of the U.S. Constitution and Wis. Const. art. I, sec. 18.
In Lemon v. Kurtzman, 403 U.S. 602 (1971), the U.S. Supreme Court noted that the establishment clause prohibited any lawrespecting the establishment of religion. Action by the state might not establish a state religion but nevertheless be one "respecting that end." The Court concluded that the following three-part test should be administered to determine whether action by the state was one respecting the establishment of religion: (1) the statute or other state action must have a secular purpose; (2) the primary effect must neither advance nor inhibit religion; and (3) the state action must not foster excessive governmental entanglement. This test has since been applied on numerous occasions by both the U.S. Supreme Court and the Wisconsin Supreme Court, the latest being Wolman v. Walter,supra, and State ex rel. Warren v. Nusbaum, supra. In Wolman the Court held that the loaning of certain instructional materials and equipment to the parents or student on individual request, even though the material was "incapable of diversion to religious use," had the primary effect of providing a direct and substantial advancement of the "sectarian enterprise."
I am aware that the state supreme court in Nebraska, State exrel. School District v. Nebraska State Bd. of Ed., 188 Neb. 1, *Page 289 
195 N.W.2d 161, cert. denied, 409 U.S. 921 (1972), and the court of appeals of Michigan, Citizens to Advance Public Education v.Porter, 65 Mich. App. 168, 237 N.W.2d 232 (1975), considered the issue of leased space and held under the U.S. Constitution and their respective state constitutions that a lease of space was constitutional. The Nebraska decision specifically involved the lease of space for Title I programs. Nebraska's constitution contains a provision similar to, although not identical with, Wisconsin's. The Nebraska decision is a split decision with strong dissents both on state and federal constitutional grounds. Several key factors exist which lead me to believe that our court would follow State ex rel. Reynolds v. Nusbaum, supra, and Paire,supra. First, Milwaukee itself assures you that the school district will impose restrictions on the use of the space by lease and then engage in continuing surveillance to insure that the restrictions designed to prevent sectarian influence were being followed. Such an arrangement involves substantial entanglement problems. Second, Wis. Const. art I, sec. 18 has been strictly interpreted in the past. I f bus transportation was unconstitutional it is hard to conceive that a lease of space with consideration flowing to the parochial school would not also be unconstitutional. Third, the U.S. Supreme Court's decision inWolman v. Walter, supra, which approved off-premises provision of therapeutic guidance and remedial programs to parochial students appears to be as far as the Court is likely to go. There is no indication in the various opinions that the court would have approved lease arrangements of the type discussed here. In fact, Justice Blackman, joined by three other justices in delivering the opinion of the court, took pains to point out that the statute authorized the services to be performed at sites "neither physically or educationally identified with the functions of the nonpublic school." Wolman, supra, p. 2605.
It is my opinion, therefore, that the lease arrangement of space in parochial schools as previously described would not only violate Wis. Const. art. 1, sec. 18, but would probably also violate the establishment clause of the first amendment for the reasons advanced in Wolman v. Walter, supra; Meek v. Pittenger,supra, and Committee For Public Education v. Nyquist, 413 U.S. 756
(1973). You are therefore advised that you should not approve the teaching of Title I students in classrooms rented from parochial schools.
BCL:JWC *Page 290