AMERICANS UNITED FOR SEPARA-
TION OF CHURCH AND STATE et al.,
Plaintiffs,
Newell J. PAIRE, as Commissioner of Education of the State of New Hampshire, et al., Defendants.

Civ. A. No. 72-3.

United States District Court,
D. New Hampshire.

May 1, 1973.

Kenneth E. Scott, Wilton, N. H., Franklin C. Salisbury, Americans United for Separation of Church and State, Washington, D. C., for Americans United for Separation of Church and State.

Howard B. Myers, Asst. Atty. Gen., for State of New Hampshire.

Robert E. Hinchey, Burns, Bryant, Hinchey, Cox & Shea, Dover, N. H., for Roman Catholic Bishop of Manchester.

Before ALDRICH and CAMPBELL, Circuit Judges, and BOWNES, District Judge.

## OPINION

LEVIN H. CAMPBELL, Circuit Judge.

Asserting a violation of the "establishment" and "free exercise" clauses of the First Amendment, the plaintiffs seek to enjoin a so-called dual enrollment arrangement entered into pursuant to New Hampshire law by the Holy Infant Jesus School of the Roman Catholic Bishop of Manchester (Holy Infant) and the Nashua School District No. 42 (the Nashua School District).

The action was originally heard and decided by the Honorable Hugh H. Bownes upon a stipulated record. The defendants appealed, and the merits were briefed and argued in the Court of Appeals. That Court, however, vacated the judgment on jurisdictional grounds not raised by the parties, holding that under 28 U.S.C. § 2281 the case should have been decided by a three-judge court. Americans United for Separation of Church and State, et al v. Newell J. Paire, et al., 475 F.2d 462 (1st Cir. 1973). By order of the Chief Judge of the Circuit dated March 22, 1973, Judge Bownes and two of the Circuit Judges who had heard the appeal were designated a three-judge court to hear the case. On March 29, 1973, the parties were granted ten days to submit additional material and informed that further oral argument would be heard only if found necessary in light of what was submitted. Thereafter, the plaintiffs by letter requested a temporary injunction prohibiting any dual enrollment program for 1973–74 and subsequent school years; and the defendants have respond-

ed in opposition. Nothing further having been submitted, the case is now ripe for decision. All members of the court have had the benefit of briefs and oral argument on the merits; we find no need for further argument.

We proceed on the understanding that the Nashua dual enrollment agreement and lease in evidence, relating to 1971–72, are materially the same as ones now in effect for 1972–73, and that the undisputed facts appearing from the pleadings and in the stipulation and attachments filed originally before Judge Bownes remain germane and valid. The parties have not notified us otherwise; their recent correspondence relative to temporary injunctive relief indicates that the dual enrollment program remains unchanged up to now.

The plaintiffs are a non-profit corporation many of whose members reside in New Hampshire, and twelve New Hampshire resident taxpayers. Seven of the latter reside in Nashua; five reside in other New Hampshire cities and towns. The individual plaintiffs regularly pay local and state taxes which in turn support public school districts throughout the State of New Hampshire. The plaintiffs' standing to bring this action is not in dispute.

The defendants are the Commissioner of Education of the State of New Hampshire, the State Treasurer of the State of New Hampshire, and the Chairman of the Board of Education, Nashua School District No. 42.

The amount in controversy exclusive of interest and costs exceeds ten thousand dollars. Jurisdiction exists under 28 U.S.C. § 1331.

The plaintiffs, both for themselves and as class representatives on behalf of all citizens, residents and taxpayers similarly situated, attack the constitutionality of a so-called dual enrollment program now in effect at Holy Infant. The program is delineated in a facilities lease agreement and a dual enrollment agreement between Holy Infant and the Nashua School District. These were drawn in strict compliance with New Hampshire statutes [1] and implementing regulations promulgated by the New

1. NH RSA 193:1–a (supp) Dual Enrollment. Notwithstanding any other provision of the law, the full-time attendance requirement may be met by attendance at more than one school provided the total time spent in the schools is equivalent to full-time attendance and further that the attendance at more than one school may include attendance at a nonpublic school provided that the school district and the state board of education have given prior approval to the detailed dual enrollment agreement, which is to be effectuated for this purpose.

NH RSA 198:21 (supp) Grants.

I. Any school district which has in operation an approved dual enrollment agreement under the provisions of RSA 193:1–a shall be granted for the first school year that such agreement is in operation the full operational costs of implementing such agreement, exclusive of any part of the cost and carrying charges of any capital improvements; and for the next succeeding school year, if such operation is then continued, one half of such costs.

II. Application for any such grant shall be submitted by a district to the state board of education no later than the July first preceding the start of the school year for which it shall be applicable, provided that the board may, for good cause shown, accept any such application up to but no later than the start of the applicable school year.

III. The board shall determine what costs shall be allowed in computing the amount of any grant, and shall make payments of such grants from the funds appropriated therefor.

IV. In the event that for any year insufficient sums are available to pay grants in full as provided by this section to all qualified applying school districts the state board of education shall prorate such grants so that all such districts receive the same proportion.

V. No pupil counted by any school district for the purpose of calculating the amount of a grant to be paid pursuant to this section shall for the same school year by the same district be included in average daily membership for the purposes of foundation aid or counted for the purposes of grants pursuant to RSA 198:22.

Hampshire State Department of Education.[2] *See* Americans United for Separation of Church and State, et al v. Paire, et al, *supra.*

Under NH RSA 193:1–a (which became effective in mid-1969), a pupil may meet New Hampshire's full time school attendance requirement by attending more than one school for periods which together total the required number of hours. Attended schools may include non-public ones, provided the school district and state board of education approve "the detailed dual enrollment agreement, which is to be effectuated for this purpose."

The New Hampshire statutes further provide for granting to a school district which has in operation such an approved dual enrollment agreement, the full operational costs of implementing the agreement during the first year, exclusive of the cost and carrying charges of capital improvements. For the next succeeding year, if such operation is then continued, one half of the costs will be paid by the state.

The somewhat enigmatic statutes are clarified by complex regulations promulgated by the New Hampshire Department of Education setting forth in detail the nature of dual enrollment agreements and the manner in which a school district may apply for state grants.

In essence they provide for the arrangement hereinafter described at Holy Infant. A public school district may lease space from a non-public school and may operate therein, using public school teachers, a so-called public school at which the non-public school students may receive part time instruction. The regulations further provide for the public school district to receive state grants under the New Hampshire statute, covering the costs of leasing the space, of the salaries of those hired to teach there, and of other related expenses.

Pursuant to the New Hampshire statutes and regulations, Holy Infant and the Nashua School District have entered into a facilities lease and dual enrollment agreement. These are stipulated to be typical of contracts entered into between other church schools and other school districts in New Hampshire.

Under the lease, five contiguous classrooms and an office all located on one corridor at one end of the second floor of the Holy Infant Jesus School, Allds Street, Nashua, are leased for the school year to the Nashua School District. The rooms are leased to the Nashua School District for its exclusive control and use during the regular school day of the school year. Holy Infant agrees to furnish proper and adequate custodial services and utilities. Holy Infant's teachers rooms, visual aid room, library, and lavatories used in connection with the let facilities are to be made available to the Nashua School District. Usable textbooks relating solely to nonsectarian subjects being taught under public school auspices are likewise to be made available. The lease provides that the classrooms are to be staffed with teachers furnished by the Nashua School Board; the curriculum is to be prescribed by the Board; and the Board has "sole jurisdiction to assign students to be instructed in the facilities." A total rental of $8,937, stipulated to be "reasonable," was to be paid by the Board to Holy Infant for the 1971–72 school year.

No crucifixes, religious symbols or artifacts exist either in the leased classrooms or in the connecting corridor. The name assigned to the leased facilities located on the second floor of Holy Infant is the Arlington Street Annex School. All the students attending the Arlington Street Annex School are students of Holy Infant.

Holy Infant is a Roman Catholic parochial school controlled by a religious or-

2. "Guidelines for Applying for Dual Enrollment and Child Benefit Services Grants", 6/12/70; "Added Guidelines", 1/26/71; "Additional Guidelines", 5/10/71; "Dual Enrollment Program Instructions, 1971–72", 8/13/71.

ganization with the purpose of propagating and promoting the Roman Catholic faith. Holy Infant contains identifying religious symbols both on the exterior and interior of the building. Holy Infant's teaching staff consists of nine nuns who wear a distinctive religious uniform.

Under the terms of the separate dual enrollment agreement, which recites that it is effectuated under RSA 193:1–a, the District agrees to permit the attendance of, and provide courses of instruction to, the students of Holy Infant.

Pursuant to a detailed program outlined in the dual enrollment agreement, the curriculum of the Arlington Street Annex School is composed of entirely secular subjects consisting of Language Arts, Science, Math, Music and Physical Education which are taught exclusively by teachers employed by the Nashua School District. These teachers are certified by the State Board of Education, are subject to the supervision and direction of the Superintendent of the Nashua Public Schools, and are subject to the same rules and regulations as all other teachers in the Nashua public school system. One of these teachers serves as principal of the Arlington Street Annex School.

The students in the Holy Infant Jesus School are all between the ages of five and fourteen, and the students in the Arlington Street Annex School are in grades four through eight. The students spend one-half day in the Holy Infant Jesus School. The Arlington Street Annex School operates on the same calendar basis as all other public schools in Nashua and has the same holidays and vacation schedule. The Holy Infant Jesus School and the Arlington Street Annex School each maintain separate attendance records. All of the textbooks and other education equipment and aids except notebooks used in the Arlington Street Annex School are furnished by the Nashua School District and are the same as those used in other public schools. Students may purchase notebooks independently from other sources. The students who receive instruction in the Arlington Street Annex School receive a separate report card from the Nashua School District evaluating their work.

The Nashua School District makes lease payments to the Holy Infant Jesus School. These payments cover leased space and custodial care. The School District makes no other payments of any kind and receives no other services from the Holy Infant Jesus School. The funds required to pay the rent under the lease between the Holy Infant Jesus School and the Nashua School District and in other dual enrollment programs throughout the state exceed $10,000 and are ultimately obtained by the taxing power of the State of New Hampshire or a subdivision thereof and are transmitted to the lessor by an agency of the state government.

New Hampshire's dual enrollment program is one of many efforts to deal with the unhappy crisis faced by Roman Catholic parochial schools. It is common knowledge that rising costs and the decline in teaching nuns make it difficult for Roman Catholic parishes in New Hampshire, as elsewhere, to support parochial schools which have heretofore assumed the burden of educating many of the state's children. Continuing attempts to deal with this sensitive and difficult problem are reflected in current as well as past proceedings in the United States Supreme Court. *See* "Arguments Before the Court", 41 U.S.L.W. 3561–3564 (April 24, 1973).

■ The First Amendment to the United States Constitution requires a substantial separation if not an unbridgeable chasm between church and state. It reads, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." In Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the First Amendment was held to apply to state legislative as well as Congressional action.

Limited forms of state aid to parochial schools are constitutional.[3] Reimbursement of bus fares and of the cost of textbooks is constitutional. Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). The traditional tax exemption of property used for religious, education or charitable purposes has been upheld. Walz v. Tax Commissioner, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Federal funds may go to build college and university facilities at church-related as well as at secular institutions of higher learning. Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). In these cases, such benefits to religious bodies as undoubtedly exist were thought to be overshadowed by valid secular aims. To a considerable extent the aid was "atmospherically indifferent on the score of religion";[4] it was part of a larger category of aid reaching well beyond religious bodies only; and it was aid which could be administered so as not to invite continual church-state friction.

However, the channelling, in one way or another, of state aid to the major teaching programs of parochial schools has, to date, been rejected. In Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed. 745 (1971) the Supreme Court ruled unconstitutional Rhode Island legislation to pay a 15% salary supplement to teachers of secular subjects at non-public schools. It similarly held unconstitutional Pennsylvania legislation permitting the state in effect to subsidize non-public school secular education by "purchasing" it from the school. The court developed three "tests" from the cumulative criteria developed over many years:

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the statute must not foster 'an excessive governmental entanglement with religion'. (pp. 612–613, 91 S.Ct. p. 2111)

Applying these "tests" here, we find, as did the court in Lemon, that the plan before us has a secular legislative purpose: educating young people in secular subjects. We do not attempt to apply the second "principal or primary effect" test, which the Lemon court similarly by-passed. It is semantically confusing in this context; and, in any event, the third "entanglement" test is dispositive.

We hold that the New Hampshire plan fosters an excessive governmental entanglement with religion. It places a "public school" physically in the middle, or here, more accurately, on the second floor, of a parochial school. Using Holy Infant facilities, the public school teachers deal entirely with pupils enrolled at Holy Infant, sharing responsibility for their total instruction with the religious nuns who teach the same pupils at other hours. Such a partnership—one might even call it a merger—requires a continual interaction of the two faculties, whatever the niceties of their legal relationship. Student discipline, joint use of common facilities, and joint concern for individual students, make interaction not only likely but unavoidable.

Holy Infant is controlled by the Roman Catholic Church for the purpose of propagating and promoting the Catholic faith. It is a religious institution. "Parochial schools involve substantial religious activity and purpose." Lemon, supra, 403 U.S. at 616, 91 S.Ct. at 2113. The joint participation of public school teachers in the daily activities of a parochial school invites either some compromise by Holy Infant's staff of their own

---

3. For a comprehensive summary of recent decisions under the Establishment and Free Exercise clauses of the First Amendment, see Judge Rubin's opinion in Wolman v. Essex, 342 F.Supp. 399, 405– 411 (S.D.Ohio, 1972), aff'd, 409 U.S. 808, 93 S.Ct. 61, 34 L.Ed.2d 69 (1972).

4. Freund, "Public Aid to Parochial Schools," 82 Harv.L.Rev. 1680–1683 (1969).

guaranteed right to the free exercise of religion, or, by the secular teachers, of their secular independence. It fuses church and state inextricably in a church-dominated setting.

Even more serious entanglement is bound to occur at higher levels. Administratively, Holy Infant has now become part of the responsibilities of the Nashua School Board. Frequent negotiations between religious and secular authorities over matters such as the number, adequacy and personality of the teachers assigned to Holy Infant would seem to be unavoidable. Catholic parents and the Bishop of Manchester must look to the School District for redress if the teaching of secular subjects at their school causes them concern in any particular. To some extent they and the regular public schools are in competition for the personnel and resources of the School District.

One of the chief aims of the First Amendment is to prevent divisive conflict along religious lines. "To have States or communities divide on the issues presented by state aid to parochial schools would tend to confuse and obscure other issues of greater urgency." Lemon, supra, at p. 622, 91 S.Ct. at 2116.

Politically the dual-enrollment program invites local and state religious partisanship. Holy Infant's contract is typical of others entered into between other New Hampshire parochial schools and school districts. Projections for up to 10,000 dual enrollment pupils were made for 1971–72. The legislation provides for 100% state aid during the first year of operation and 50% for the next year. School districts as well as the state legislature will have to decide regularly how much money is to be diverted towards support of the program. The New Hampshire regulations provide that dual enrollment agreements must be approved by vote of the school district or, in certain cities, the city council, board of aldermen or other governmental unit. Thereafter they must be approved by the state board of education. To obtain

continued and increased aid, Catholics can be expected to engage in political activity at the state and local levels. Non-Catholics may well oppose them.

Moreover, every denominational and private school group in New Hampshire cannot, obviously, expect to be tendered a dual enrollment program tailored to its own separate educational goals. Political lines may thus be drawn between Catholic and other religious and private school groups. As the machinery of the program does not lend itself readily to equal treatment of all groups, it invites competition along religious lines for acquisition of scarce funds; groups with established religious schools are the most likely to succeed. State and local authorities may be thrust into denominational wrangling like that which fragmented New York in the early part of the 19th Century. See concurring opinion of Brennan, J., Lemon, supra, 645–647, 91 S.Ct. 2105.

New Hampshire is in theory aiding "public schools." But creating mini-public schools within the bosom of parochial schools is merely a legalistic way of channelling direct financial aid to the latter on a broad front. A pupil attending the "Arlington Street Annex School" could have no doubt that his real school was Holy Infant. The School District's rental payments under the lease are, in fact, a direct financial subsidy to Holy Infant. While the District, in theory, receives a benefit (the leased premises), it holds them solely in order to confer further benefits upon Holy Infant. The lease payments amount to a pure gratuity which can be used by the parochial school for its own religious purposes.

Defendants seek to distinguish Lemon on the ground that the Rhode Island and Pennsylvania teachers, hired by the parochial school, were found to be likely to instill religious content into the teaching of secular subjects. This may be so, although nothing in the New Hampshire law or regulations prevents the School District from assigning teachers to Holy Infant equally sympathetic to its religious mission. But we do not read Lem-

*on* as turning solely on the danger of religious indoctrination. The Court pointed out that to avoid indoctrination, the state would have to provide a "comprehensive, discriminating and continuing state surveillance . . . These prophylactic contacts will involve excessive and enduring entanglement between state and church." *Lemon, supra,* 619, 91 S.Ct. 2114. In the present case, New Hampshire can be said to have achieved the ultimate in prophylactic contact: placing a public school within a parochial school. By so doing, while it may have reduced indoctrination, it has exacerbated entanglement to a point beyond that in *Lemon.*

We do not say, of course, that a released time program for students attending a normal public school would necessarily be unconstitutional. We hold merely that the creating and financing of an artificial public school within a church school creates a constitutionally impermissible entangling of church and state. A quite similar program was recently held unconstitutional in Vermont. Americans United for Separation of Church and State v. Oakey, 339 F.Supp. 545 (D.Vt.1972).

## DECLARATION AND ORDER

The lease and dual enrollment agreement between the Holy Infant Jesus School and the Nashua School District for the year 1971–72 and for the current year are hereby declared to violate the First and Fourteenth Amendments of the United States Constitution.

NH RSA 193:1–a and 198:21, and all regulations promulgated thereunder, to the extent they purport to authorize such leases and dual enrollment agreements between a church-sponsored non-public school and a public school district, and for state funding thereof, are hereby declared to violate the First and Fourteenth Amendments of the United States Constitution.

Nothing herein is intended to prevent completion of commitments and payment of preexisting grants for the school year 1972–73 or previous years. *See* Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973).

A permanent injunction shall issue enjoining the defendants, their servants, agents and employees from negotiating, making, executing, approving or funding for the school year 1973–74 or future years any leases or dual enrollment agreements, between the Holy Infant Jesus School and the Nashua School District No. 42 similar to those executed for 1971–72 or for the current school year.

No costs.