**Leona P. THOMAS and Augusta P. Finklestein, for themselves and those similarly situated**

v.

**Thomas C. SCHMIDT, Commissioner of Education of the State of Rhode Island, et al.**

**Civ. A. No. 74-26.**

United States District Court,
D. Rhode Island.

June 30, 1975.

Allan M. Shine, Providence, R. I., Amato C. DeLuca, Warwick, R. I., for plaintiffs.

Julius C. Michaelson, Atty. Gen., R. I., Providence, R. I., Paul B. McMahon, William T. Murphy, Pawtucket, R. I., Richard P. McMahon, Providence, R. I., for defendants.

———◆———

## OPINION

PETTINE, Chief Judge.

The plaintiffs, residents and taxpayers of Woonsocket, Rhode Island, bring this action individually and on behalf of all other taxpayers similarly situated to enjoin an allegedly unconstitutional expenditure of State and local public funds to lease facilities for use by the East Woonsocket School, a public elementary school, from defendant St. Joseph's Church, a Catholic sectarian institution. The facilities in question are located in a building known as St. Joseph's School, in which the Woonsocket Catholic Regional School is operated under Roman Catholic auspices.

The amended complaint alleges that the lease agreement was entered into by the defendant School Committee for the City of Woonsocket pursuant to R.I. Gen'l Laws 1956 (1969 Reenactment) § 16–2–15[1] and further alleges that the State of Rhode Island through the defendant State Board of Regents for Education, the defendant Commissioner and Associate Commissioner of the State Department of Education, and the defendant State Treasurer, has paid or will cause payment of State tax funds pursuant to R.I. Gen'l Laws 1956 (1969 Reenactment) § 16–7–15 *et seq.* to the School Committee for the City of Woonsocket to reimburse the School Committee for the cost of its leasing the facilities in question and for the cost of renovations to the St. Joseph's School building, which was required to transform certain space in the building into classrooms. The plaintiffs contend that this lease agreement with a sectarian institution and the concomitant expenditure of public funds in furtherance thereof violate the religion clauses of the First Amendment to the United States Constitution as made applicable to the states through the Fourteenth Amendment. The plaintiffs contend that the lease agreement violates the Establishment Clause because it provides for direct financial aid out of State funds to sectarian institutions and involves excessive government entanglement with religion and that they violate the Free Exercise Clause because they constitute compulsory taxation for religious purposes. Plaintiffs seek as relief a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 (1970) that the above described actions violate the First and Fourteenth Amendments to the United States Constitution and an order temporarily and permanently enjoining the defendants from further performance of the terms of the lease agreement and from making any additional expenditures of public funds in furtherance of this lease.

Jurisdiction is based upon 42 U.S.C. § 1983 and 28 U.S.C. § 1343 (1970). At

1. Quoted in *Thomas v. Burke*, 379 F.Supp. 231, 232–233 n.1 (D.R.I.1974).

earlier stages of this litigation, this Court granted plaintiffs' motion for certification of a class action, by Order of June 25, 1974 (unreported opinion), and denied plaintiffs' motion for convening a three-judge court, *Thomas v. Burke*, 379 F.Supp. 231 (D.R.I.1974). This Court now finds that the lease arrangements challenged by the plaintiffs do not violate the First and Fourteenth Amendments and enters judgment for the defendants.

## I.

In the spring of 1973, the School Department of the City of Woonsocket was faced with a critical shortage of classroom space, especially in the area known as the East Woonsocket District. In order to solve the space shortage, school authorities undertook a study of alternatives, including bussing, double sessions, and rental of vacant space. After consultation with the office of the State Commissioner of Education and a public hearing conducted by the School Committee with the residents of the East Woonsocket area, school officials approached representatives of the defendant, St. Joseph's Church, to ascertain whether there was any possibility of obtaining classroom space in the St. Joseph's School building. On September 1, 1973, the Woonsocket Education Department, through the Woonsocket School Committee, entered into a lease with the St. Joseph's School for the rental of four classrooms in the building that houses the Catholic Regional School. The term of the lease was 10 months, renewable at the discretion of the tenant Woonsocket Education Department for five consecutive periods from September 1 through June 30 each year. Two of the classrooms have been constructed in the basement of the building with the permission of St. Joseph's School. The lease provided that any improvements made by the School Committee remain its property and may be removed upon the expiration of the rental agreement. A second lease was executed between St. Joseph's Church and the City of Woonsocket on October 27, 1974. Most of the pertinent provisions of the 1973 lease are also included in the second lease.

The classrooms leased by the Woonsocket Education Department house four third-grade classes, which are considered by the public school authorities to be part of the East Woonsocket School, a public elementary school located two-tenths of a mile away. The plaintiffs do not allege that these classrooms are used to conduct classes for children enrolled in the private sectarian school; nor do they allege that public school teachers will conduct classes for students enrolled in the Catholic Regional School. The lease represents nothing more than a pure rental of space resulting from a determination by the public school officials that additional facilities were needed to house students attending public school. Public school students are taught in these classrooms by public school teachers under the administration of public school authorities.

The St. Joseph's School building is part of a compound that also includes a church and a rectory. There is a large cross and the words "St. Joseph's School" and "Ecole de St. Joseph" on the south wall of the front of the school, and a religious statue near the north end of the building. There are no signs inside or outside the building indicating that it also houses a public school. The Regional Catholic School utilizes the remainder of the building at roughly the same time as the public school occupies its part of the building.[2] The Catholic school does not own the building but rather, like the public school, is a tenant of St. Joseph's Church. Several of the teachers in the Regional Catholic School are nuns who wear religious habit. Some of the rooms and corridors occupied by the Catholic school contain pictures with religious themes, and the school occasion-

2. The Regional School day begins and ends approximately fifteen minutes before the public school day.

ally conducts religious exercises for its students.

The four classrooms leased by the public school are all located in the northern part of the building and are set off from the rest of the classrooms. The public school has exclusive use of separate lavatories and separate entrances to its part of the building. The leased premises are under the sole physical control of the public school authorities subject to the customary landlord-tenant relationship. No religious artifacts are displayed in any of the public school rooms or corridors. The library of the Catholic Regional School is located at the southern end of the main floor corridor housing two of the public school classrooms, but is used solely by the Catholic school students. The public school students use the library at the East Woonsocket School, as well as attend assemblies there and eat hot lunches there. The public school students occasionally use the St. Joseph's gym or cafeteria, but only when they are not being used by Catholic school students. The gym is located off the northern end of the main floor corridor housing the public school classrooms. The other two public school classrooms were constructed in a portion of the cafeteria in the basement. The principal of the East Woonsocket School, who has administrative responsibility over the public school facilities at St. Joseph's, has prepared written regulations governing the conduct of public school teachers and students at St. Joseph's and the use of the facilities there, and visits the leased premises on a weekly basis to see that the regulations are properly followed. The testimony revealed that there is no opportunity for contact between the students except before and after school. *See* note 2 *supra*.

## II.

Plaintiffs' objections to this lease agreement are rooted primarily in the Establishment Clause.[3] Plaintiffs contend that the program has the effect of advancing religion by providing financial aid out of State and local tax revenues to a sectarian parochial school and by placing public school children of an impressionable age in a physical environment with a religious atmosphere that tends to foster religious worship and belief. They also contend that the administration of this leasing agreement creates an excessive involvement by the State of Rhode Island and the City of Woonsocket in the affairs of a church related school.

At the outset, I note the directive of the United States Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), regarding the factors to be considered in Establishment Clause cases:

"Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . . ; finally, the statute must not foster 'an excessive government entanglement with religion.'" 403 U.S. at 612–13, 91 S.Ct. at 2111, *citing Board of Education v. Allen*, 392 U.S. 236, 243, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); *Walz v. Tax Commission of the City of N.Y.*, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

The Court recently reaffirmed its commitment to this approach in *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44

---

3. In their amended complaint, plaintiffs also make a Free Exercise Clause argument, contending that these programs constitute compulsory taxation for religious purposes. The Court need not reach this argument because it is derivative of the Establishment Clause argument. By finding that this lease ar-

rangement does not tend to "establish" religion, I have, in effect, found that the state tax revenues in question are not being used for religious purposes.

For a discussion of the relationship of other Free Exercise Clause arguments and this case see p. 216, *infra*.

L.Ed.2d 217 (1975). It noted, however, "that the tests must not be viewed as setting the precise limits to the necessary constitutional inquiry, but serve only as guidelines with which to identify instances in which the objectives of the Establishment Clause have been impaired". *Id.* at 359, 95 S.Ct. at 1760. Similarly, in *Tilton v. Richardson,* 403 U.S. 672, 677, 91 S.Ct. 2091, 2095, 29 L. Ed.2d 790 (1971), the Chief Justice in a plurality opinion made "the candid acknowledgment that there is no single constitutional caliper that can be used to measure the precise degree to which these three factors are present or absent". It should also be noted at this point that, "despite . . . the 'sweep of the absolute prohibitions' of the [Religion] Clauses, this Nation's history has not been one of entirely sanitized separation between Church and State. It has never been thought either possible or desirable to enforce a regime of total separation . . . ." *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 760, 93 S.Ct. 2955, 2959, 37 L.Ed.2d 948 (1973). Rather, what the Supreme Court decisions require is a careful examination of any law challenged on Establishment Clause grounds to determine whether it furthers any of the evils against which that Clause protects. "Primary among those evils have been 'sponsorship, financial support, and active involvement of the sovereign in religious activit[ies].'" *Id.* at 772, 93 S.Ct. at 2965; *Lemon v. Kurtzman, supra,* 403 U.S. at 612, 91 S.Ct. 2105. *See also Meek v. Pittenger, supra,* 421 U.S. at 359, 95 S.Ct. at 1760. With these caveats in mind, we can proceed to an evaluation of the challenged leasing arrangement in light of the three tests outlined in *Lemon.*

### A.

■ The first test facing governmental action challenged under the Establishment Clause is that the action have a secular legislative purpose. It is note-worthy that in only one of all the major cases decided under the Establishment Clause did the Court find a secular purpose lacking. *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (invalidating statute prohibiting public school teachers from teaching the theory of evolution). Even in the school prayer cases, *School Dist. of Abington Township, Pa. v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), the secular purpose of inculcating moral values was recognized.

■ In the instant case, the legislative authority for the leasing of public school space by local school committees is contained in R.I. Gen'l Laws 1956 (1969 Reenactment) § 16–2–15. This is the general statutory authorization to school committees to manage, control, and operate property for public school purposes and it provides, *inter alia,* that "the school committee of any town may provide public school housing for the town by lease of buildings or portions thereof . . . ." There is nothing in the statute that directly or indirectly imports any nonsecular legislative objective, and the plaintiffs do not appear to argue otherwise. Nor is there evidence that the Woonsocket School Committee entered into the challenged lease agreement to achieve nonsecular objectives. As discussed *infra* at 209–211, I conclude that the lease represents nothing more than a pure rental of space to alleviate a shortage of classroom space in the Woonsocket public schools. But even if the plaintiffs could establish that the purpose of the lease arrangement was to provide aid to a church related private school, *Committee for Public Education & Religious Liberty v. Nyquist, supra,* and *Lemon v. Kurtzman, supra,* indicate that this would not necessarily constitute a nonsecular purpose.

### B.

■ Plaintiffs contend that the challenged leasing agreement has the pri-

mary effect of advancing religion because it: a) provides financial aid to a sectarian parochial school, and b) places public school children in a religious, church related physical environment. Before evaluating these claims, it should be noted that as the Supreme Court has applied the *Lemon* test, the term "primary effect" essentially means "an important effect". "Our cases simply do not support the notion that a law found to have a 'primary' effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion. . . ." *Committee for Public Education & Religious Liberty v. Nyquist, supra,* 413 U.S. at 783 n. 39, 93 S.Ct. at 2971. As explained by the Court of Appeals for the District of Columbia, "Government action may have *multiple* 'primary' effects." *Allen v. Morton,* 161 U.S.App. D.C. 239, 495 F.2d 65, 70 (1973) (emphasis added). Thus, a finding by this Court that a primary effect of the leasing agreement in the instant case is simply to make classroom space available to the Woonsocket public schools does not preclude a finding that *other* primary effects of the arrangement advance religion in violation of the First Amendment. Nevertheless, I must conclude that the facts of this particular case do not warrant such a holding.

Very little evidence has been advanced supporting the plaintiffs' contention that the challenged lease agreement constitutes aid to the Catholic Regional School. On the contrary, the clear weight of the evidence indicates that the Catholic school receives no significant benefits from the presence of the public school in the St. Joseph's School building and that the lease agreement was intended solely as a means to obtain classroom space for the Woonsocket public schools and not at all as a subterfuge for providing aid to St. Joseph's Church or the Catholic Regional School. A key factor supporting this conclusion is the fact that no financial benefits whatsoever accrue to the Catholic Regional School as a result of the lease agreement. The lease agreement complained of is between the Woonsocket Education Department and St. Joseph's Church, *not* the Catholic Regional School, which is an independent corporate entity separate and apart from St. Joseph's Church. It is undisputed that the lease arrangement was made strictly as an accommodation to the Woonsocket public schools. The very concept of the Regional School, *i. e.,* the coalescence of children from thirteen parishes in one school, refutes any suggestion that the Regional School could not by itself make maximum use of the St. Joseph's School building. To the contrary the record establishes that prior to entering the lease arrangement to house the public school third grade classes, the East Woonsocket public school's lease of classroom space in St. Joseph's for its sixth grade classes had been terminated by the Church because the Regional School required more space.

The plaintiffs do not argue that the rental of space for public school classrooms from a religious institution is unconstitutional *per se.*[4] On the contrary,

---

4. This question has been addressed in only a small number of cases. In *Lemke v. Black,* 376 F.Supp. 87 (E.D.Wis.1974), the Court held the use of a church for a public school graduation ceremony unconstitutional, but it did so on entanglement and free exercise grounds in light of certain facts peculiar to that case. The Court did state, however, that the "use of a church facility by a state agency for a secular purpose is not *per se* a violation of the Fifth Amendment." *Id.* at 88. In *State of Nebraska ex rel. School Dist. of Hartington v. Nebraska State Board of Educ.,* 188 Neb. 1, 195 N.W.2d 161, *cert. denied,* 409 U.S. 921, 93 S.Ct. 220, 34 L.Ed. 2d 182 (1972), the Nebraska Supreme Court rejected plaintiffs' challenge of the use of federal funds under Title I of the Elementary and Secondary Education Act for the rental of two classrooms in a Roman Catholic high school to be used for remedial classes serving students of both the public and parochial schools. The case focused on the participation of parochial school students in the program, the Court recognizing "the right of a public school district to use or

they admit that the Woonsocket Education Department presently rents classroom space in three other nonpublic schools, in which public school students are the only students in the rented buildings, and they do not challenge these arrangements; in fact, plaintiffs explicitly state that an alternative, and to them a more acceptable, solution to the shortage of classroom space in the public schools would be the rental of space in St. Charles' parochial school, which is currently vacant. The true grounds for the plaintiffs' challenge to the lease agreement, therefore, is not that monies are being transferred from the state to a Sectarian institution in exchange for classroom space, but that such space is being rented in a building which is simultaneously being used as a parochial school.

Even if the rental payments were made directly to the Catholic Regional School, the circumstances surrounding the agreement would cast great doubt upon a conclusion that such an arrangement was entered into for the purpose of, or with the actual result of, aiding or subsidizing the Catholic school. The agreed upon yearly rent, $5000. plus the cost of heat, utilities, and maintenance, appears to be extremely reasonable, especially in light of testimony that it costs the Woonsocket Education De-

partment approximately $14,000 per year to operate a four-classroom public school building of its own comparable to the facilities rented in the St. Joseph's School. The lease provides that any structural improvements made by the public school remain its property and may be removed from St. Joseph's School upon termination of the agreement, thus denying the benefit of such improvements to St. Joseph's Church or the Catholic Regional School. The arrangement was solicitied by the Woonsocket Education Department upon a suggestion taken from the floor at a public hearing addressed to the classroom shortage only after other alternatives were explored and rejected by local public school authorities.[5] Strong evidence that the arrangement does not constitute a subsidy of religious activities lies in the fact that St. Joseph's church was initially reluctant to rent the space to the public school and did so only as an accommodation to the public school, since it had planned to make the entire building available to the Catholic Regional School. Finally, it should be noted that the classroom shortage still exists in the Woonsocket public school system. The public school authorities view the lease agreement as only a temporary expedient and have already spent $30,000. on a study for the con-

---

lease all or a part of a church or other sectarian building for public school purposes . . . ." *Id.* at 3, 195 N.W.2d at 163. In an opinion accompanying the United States Supreme Court's denial of certiorari in that case Justice Brennan indicated that he found nothing objectionable in the arrangement at least regarding the rental of space: "There is not the slightest suggestion that this was a subterfuge to make a subsidy to the parochial school, or anything except an arrangement motivated solely by the lack of space in the public schools." 409 U.S. at 925, 93 S.Ct. at 222. The question whether Title I funds can be used to support programs on the premises of parochial schools was left unanswered by the Supreme Court in *Wheeler v. Barrera*, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974), but the Court did indicate that such an arrangement would not be unconstitutional *per se*: "[T]he range of

possibilities [for such programs] is a broad one and the First Amendment implications may vary according to the precise contours of the plan that is formulated. . . ." 417 U.S. at 426, 94 S.Ct. at 2287.

5. Plaintiffs argue that a viable alternative exists in the St. Charles' School, a vacant parochial school in which the Woonsocket Education Department has leased classrooms in the past. It is unclear whether this facility is in fact available, but the public school authorities argue that St. Charles' School is less satisfactory than St. Joseph's because of more limited parking spaces for faculty and because use of that school would require bussing the students across town. In support of the public school's position, it should be noted that St. Joseph's School is only two-tenths of a mile from the East Woonsocket School.

struction of a new facility in the East Woonsocket District.

■ Of course, it is true that some religious institution, whether it be St. Joseph's Church or the Catholic Regional School, is receiving monies from the State as a result of this lease. These benefits, however, are indirect and incidental, and "it is clear that not all legislative programs that provide indirect or incidental benefit to a religious institution are prohibited by the Constitution." *Meek v. Pittenger, supra,* 421 U.S. at 359, 95 S.Ct. at 1760. "Whatever may be its initial appeal, the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected." *Hunt v. McNair,* 413 U.S. 734, 742, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). *See Walz v. Tax Comm'n, supra; Tilton v. Richardson, supra.*

■ The plaintiffs' second contention, that the lease arrangement has the primary effect of advancing religion by placing public school children in a religious environment, must also fail. The evidence in the instant case falls far short of presenting the kind of situation with which the Supreme Court dealt in the school prayer and bible reading cases, *School Dist. of Abington Township, Pa., v. Schempp, supra,* and *Engel v. Vitale, supra,* where the public school authorities were sponsoring activities that could have no effect other than to promote religion.

It is not disputed that the Catholic Regional School, which shares the St. Joseph's School building with the four public school third-grade classes, is a church related private school carrying out a religious mission. Some of the school's teachers are nuns who wear religious habit, some of its classrooms and corridors are decorated with pictures with religious themes, and religious hymns are sometimes sung and religious services sometimes conducted on the premises. There is a cross on one wall of the building and a religious statue near another, and the building is located in a complex also containing a church and a rectory. It appears, however, that the physical isolation of the leased facilities and the additional precautions the public school authorities have taken against intermingling of the public school students with the parochial school students substantially insulate the public school students from the religious atmosphere of the Catholic Regional School. To the extent the public school students are exposed to religious influences as a result of the lease agreement, these contacts are indirect, incidental, and inconsequential.

The four leased classrooms are located together in one part of the building with a separate entrance, lobby, corridors, stairwell, and lavatories. There are no religious pictures or artifacts in or near these areas. Under the lease the public school authorities have exclusive control of their classrooms, and the evidence indicates that such control is in fact maintained by the four public school teachers under the supervision of their superiors. There is no evidence that the four third-grade classes are involved in any way in the religious activities of the Catholic Regional School. The Catholic school library is not used by the public school students, and the Catholic school facilities occasionally used by the public school classes—the gym and the cafeteria—are never used by students from the two schools at the same time. The students of the two schools sometimes mingle in the school yard before and after school, but this contact is lessened by the fact that the two schools have slightly different hours of operation: the school day and recess and lunch periods of the two schools do not begin and end simultaneously. *See* note 2 *supra.* Fifteen fire drills per year are held for the whole building together, however, and during these drills the students and teachers from both schools are in the corridors and school yard together. The principal of the East Woonsocket School

has promulgated written regulations governing the conduct of the public school teachers and students in the St. Joseph's School building and the use of the facilities there regarding these and other matters, in order to ensure that all public school activity would be kept separate and apart from the Catholic Regional School faculty and student body. To further ensure that the rules are followed, the principal visits the St. Joseph's School on a weekly basis.

The evidence indicates, then, that the exposure of the public school students to religious influence from the Catholic school is minimal. Within the leased facilities, the public school children are completely sheltered, for even the sound of religious hymns being sung in the Catholic school is rarely audible in the public school classrooms. The public school students' contact with religious influences therefore seems limited to passing a cross, a religions statue, and a church as they approach the entrance to their school, brief periods of contact with Catholic school students in the school yard and on fire drills, when religious activities are least likely to be underway, and the possibility that unsupervised public school children out of their classroom to go to the lavatory, or to bring a note to another teacher, etc., may, against public school rules, wander into another section of the building. These contacts seem little more likely to subject public school children to undue religious influences than the location of a public school right next to a parochial school on the same city block, a happen-stance clearly beyond First Amendment challenge. Certainly these contacts do not constitute evidence that a primary effect of the leasing arrangement is the promotion of religion.

## C.

 Even where a government program has both a secular purpose and primary effect, it may violate the Establishment Clause if its administration would entail an impermissible intrusion or entanglement with the affairs of religious institutions. According to the Supreme Court in *Walz v. Tax Comm'n, supra*, 397 U.S. at 675, 90 S.Ct. at 1414, "the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." It is this third part of the three-part test outlined in *Lemon v. Kurtzman, supra*, that poses the greatest difficulty for the lease agreement challenged in this case.[6] For though the public school authorities have taken adequate precautions to ensure that the primary effect of the lease does not promote religion, there is a danger that the taking of these precautions may itself result in excessive entanglement:

> "It can well be that in order to avoid the Scylla of the 'primary effect' test by carefully setting up limitations and restrictions with reference to use of state aid funds the state may find that the supervision required to police the grant causes it to become so deeply 'entangled' in religious matters as

---

6. The defendants argue that the entanglement test should not be applied in the instant case at all, because it is associated primarily with cases involving subsidies of religious institutions, *e. g., Lemon v. Kurtzman, supra; Committee for Public Educ. v. Nyquist, supra; Walz v. Tax Comm'n, supra* (viewing a tax exemption as a subsidy). There is nothing in the entanglement cases, however, that limits the application of that test to subsidy cases. On the contrary, the Court in *Nyquist* asserted that the three-part test "is a product of considerations derived from the *full sweep* of the Establish-ment Clause cases." 413 U.S. at 772, 93 S. Ct. at 2965 (emphasis added). It is true that in the subsidy cases the entanglement question is related to the subsidy issue, because without the prohibited entanglement there would have been a prohibited primary effect—financial aid to religious institutions. But a parallel relationship exists between these two considerations in the present case as well: without the allegedly entangling safeguard measures, the lease agreement might have had the primary effect of exposing public school children to religious influences.

to find its plan shipwrecked on the Charybdis of overinvolvement in parochial matters."

*Americans United for Separation of Church and State v. Oakey,* 339 F. Supp. 545, 550 (D.Vt.1973) (three-judge court).

Whether the entanglement with religion involved in administering a government program is excessive is a question of degree and must be determined by the facts of the particular case before the Court. Three factors, however, can be gleaned from the Supreme Court cases to guide us in our inquiry. The first criterion focuses on the number and duration of the contacts involved. In *Lemon v. Kurtzman, supra,* the Court distinguished *Board of Education v. Allen, supra,* in which the loan of textbooks on secular subjects to students attending parochial schools had been upheld, and found that a Rhode Island statute authorizing salary supplements for teachers of secular subjects in parochial schools was unconstitutional on entanglement grounds:

> "A comprehensive, discriminating, and continuing state of surveillance will inevitably be required to ensure that . . . the First Amendment [is] . . . respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church."

*Lemon v. Kurtzman, supra,* 403 U.S. at 619, 91 S.Ct. at 2114.

The above quotation from *Lemon* also illustrates the second criterion, whether the points of contact arise on ideological or nonideological matters. In *Meek v.*

*Pittenger, supra,* the Court reaffirmed its holding in a companion case to *Lemon* that "the prophylactic contacts required to ensure that teachers play a strictly nonideological role . . . necessarily give rise to a constitutionally intolerable degree of entanglement between church and state." 421 U.S. at 370, 95 S.Ct. at 1765. In *Tilton v. Richardson, supra,* in contrast, the Court noted that the degree of entanglement involved in a program providing federal aid to church related colleges for the construction of buildings "is . . . lessened here by the nonideological character of the aid that the Government provides. . . ." 403 U.S. at 687, 91 S.Ct. at 2100. Finally, contacts are less likely to be found excessively entangling if the government agency is not required to inspect the religious institution's financial records. Again in *Tilton,* where the aid program was upheld, the Court noted:

> "There is no continuing financial relationship or dependencies, no annual audits, and no government analysis of an institution's expenditures on secular as distinguished from religious activities. Inspection as to use is a minimal contact." *Id.,* 403 U.S. at 688, 91 S.Ct. at 2100.

When these criteria are applied to the instant case, the lease arrangement does not result in excessive entanglement. There are only three points of potential entanglement in the administration of the instant lease agreement: the regulations issued by the principal of the East Woonsocket School; the visits to St. Joseph's School by the principal and the Woonsocket Superintendent of Schools; and the conference between the principals of the East Woonsocket School and the Catholic Regional School.[7] The regulations, however, were

---

7. The teachers in the two schools may come in contact with each other informally in the teachers' lounge, which the Catholic school teachers share with the public school teachers, and in their official capacities during fire drills. The former contacts are of a so-

cial, not business nature and are not required by or a necessary concomitant to the lease agreement. The latter contacts are so brief and nonideological that they pose no threat of excessive entanglement.

unilaterally promulgated and affect only public school personnel. They cannot and do not have any disruptive effect on the religious activities of the Catholic school. The weekly visits of the East Woonsocket principal and the less frequent visits of the Superintendent are also directed to public school personnel and activities. To the extent that these visits do result in contact with personnel of the Catholic Regional School, these contacts do not constitute excessive entanglement. Though fairly frequent, the visits are brief; they entail no inspection of financial records; and the subject matter of such visits is nonideological, i. e., the regulation and allocation of the use of physical space. For similar reasons, the annual conference between the two principals at the beginning of the year is also permissible contact. It is infrequent and of short duration, and the only subjects of discussion are the allocation of space, scheduling, and similar matters.

It is thus clear that the lease arrangement has not resulted nor is likely to result in excessive or ideological government intrusion into the affairs of the religious school. Furthermore from the Regional School viewpoint there is no evidence that the lease arrangement has caused, or is likely to cause, the Regional School to modify or restrict the religious nature of its instruction due to the presence of the public school in part of the school building. The only accommodations to the dual presence which have been made by either the public or Catholic school authorities have been related to enforcement of the lease (vis-à-vis exclusive possession of their respective portions of the premises) and to avoidance of scheduling conflicts. These are clearly nonideological in nature.

The plaintiffs cite several "dual enrollment" cases for the proposition that the mere location of public school classes in a building shared with a parochial school involves excessive entanglement. *Americans United for Separation of Church and State v. Board of Education of Beechwood Independent School Dist.*, 369 F.Supp. 1059 (E.D.Ky.1974); *Americans United for Separation of Church and State v. Paire*, 359 F.Supp. 505 (D.N.H.1973) (three-court judge); *Americans United for Separation of Church and State v. Oakey, supra.* In *Beechwood*, the court noted that "a cursory appraisal of the aid program reveals excessive administrative entanglement represented by both routine and potential contacts between the two schools", 369 F.Supp. at 1064–65, and in *Paire* the Court, per Judge Campbell, held that "creating and financing an artificial public school within a church school creates a constitutionally impermissible entangling of church and state". 359 F.Supp. at 512.

The fact distinguishing all of these dual enrollment cases from the instant case cannot easily be disregarded. A parochial school and a public school in a dual enrollment arrangement are not merely sharing the same building; they are sharing the same students. The two schools at best effectuate a partnership, if not for all intents and purposes a complete merger. Extensive contacts between the two faculties and administrations are inevitable as they seek to protect the welfare of their common student body, in dividing up the curriculum, assigning teachers, dealing with parents' complaints, etc. *Id.* at 510. Thus when the Court in *Paire* refers to "an *artificial* public school within a' church school" (emphasis added), it refers to a public school that is not merely physically within the same building, but one that is functionally the very same school. "A pupil attending the 'Arlington Street Annex School,'" the Court points out "could have no doubt that his real school was Holy Infant". *Id.* at 511. This is clearly not the case in Woonsocket; there is little question that the third graders whose classes meet in the St. Joseph's School building know that they are students of the East Woonsocket School and not the Catholic Regional School.

A separate aspect of the entanglement question, and one which Justice Brennan recently categorized as a fourth step in the *Lemon* test, *see Meek v. Pittenger, supra,* 421 U.S. at 373, 95 S.Ct. 1753 (Brennan, J., concurring), is the concern with political entanglement:

"A broader base of entanglement of yet a different character is presented by the divisive political potential of these state programs. . . . Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect." *Lemon v. Kurtzman, supra,* 403 U.S. at 622, 91 S.Ct. at 2115. *See also Walz v. Tax Comm'n, supra,* 397 U.S. at 695, 90 S.Ct. 1409 (Harlan, J., concurring).

This approach offers a second means of distinguishing the dual enrollment cases. Dual enrollment programs are a form of aid to parochial schools. Such aid programs are particularly vulnerable to political entanglement challenges because the issue of aid to parochial schools is controversial and divisive along religious lines and because their potential for divisiveness is aggravated by the need for continuing annual appropriations. *See Lemon, supra,* 403 U.S. at 623, 91 S.Ct. 2105. The lease agreement challenged in this case, in contrast, is subject to neither liability. It is not a form of aid to parochial schools, and it appears to be a temporary expedient which will not necessarily require renewal year after year.

### III.

▮ In summary, I find that the lease agreement between the Woonsocket Education Department and St. Joseph's Church does not violate the Establishment Clause of the First Amendment. It is a governmental program that has a secular legislative purpose, that does not

have a primary purpose which either advances or inhibits religion, and that does not result in excessive entanglement with religion.

▮ It might be appropriate, however, to add a few words of qualification to this opinion. Adjudication under the religion clauses is a delicate matter, and the fact that this particular lease agreement passes constitutional muster by no means authorizes public school authorities in Rhode Island to enter into such agreements cavalierly without fear of constitutional attack. " . . . Government involvement with religion should be kept to a necessary minimum, and . . . there should be avoided not only the actual interference but also the potential for and appearance of interference with religion." *Allen v. Morton, supra,* 495 F.2d at 75. The principle of separation of church and state is especially important in the area of education:

"It is implicit, in the history and character of American public education that the public schools serve a uniquely *public* function: the training of American citizens in an atmosphere free of parochial [divisions], or separatist influences of any sort—an atmosphere in which children may assimilate a heritage common to all American groups and religions." *School Dist. of Abington Township, Pa. v. Schempp, supra,* 374 U.S. at 241–42, 83 S.Ct. at 1582. (Brennan, J., concurring) (emphasis in original).

Other lease arrangements similar to the one upheld in this case should be subject to similar scrutiny, and they should be struck down if there is evidence that they are clever disguises for subsidies, or that the students are not sufficiently shielded from undue religious influence, or that the administration of the program or the political circumstances surrounding its adoption lead to excessive entanglement of government and religion.

.It should also be noted that the plaintiffs did not raise any independent Free Exercise Clause arguments in this case. *See* note 3, *supra.* Such arguments could conceivably have made a difference in the result. In *Lemke v. Black, supra,* for example, the Court found that for a public school to hold its graduation ceremonies in a church resulted in excessive entanglement on the grounds of political divisiveness. A key factor in the Court reaching this conclusion was its finding that the decision to hold the graduation in a church was made in the midst of sectarian opposition and with the knowledge that some prospective participants could not attend the ceremony without violating their consciences. 376 F.Supp. at 89–90. In *Berman v. Board of Elections of the City of N. Y.,* 420 F.2d 684 (2d Cir. 1969) (per curiam), *cert. denied,* 397 U.S. 1065, 90 S.Ct. 1502, 25 L. Ed.2d 687, the plaintiff contended that the location of the polls in his voting district in a church burdened his right of free exercise since it was not possible for him to enter a non-Jewish house of worship for the purpose of voting without violating the tenets of his religion. His appeal was dismissed as moot after the Board of Elections amended its regulations, permitting those who objected to voting in a church to vote by absentee ballot or in an adjoining district.

What would be the result if parents of third-grade students in East Woonsocket argued that the lease arrangement in this case burdened their children's right of free exercise by requiring them to attend school in the midst of a complex of religious buildings? If they prevailed, would it be sufficient for the public school officials to provide for exceptions for individual students, or would the entire lease arrangement be nullified? *Cf. School Dist. of Abington Township, Pa. v. Schempp, supra,* 374 U.S. at 288–89, 83 S.Ct. 1560, (Brennan, J., concurring). I can, of course, do no more than raise these questions. I raise them only to illustrate the complexity of the issues presented by lease agreements such as the one I uphold today, and to emphasize that this decision should be construed narrowly and restricted to the facts of this particular case.

Plaintiffs' motion is hereby denied.

Judgment entered for the defendants. Defendants shall enter an order accordingly.